_____

# Exhibit 5

**Redline Comparison (Proposed TAC vs. Filed TAC)**
_____

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

COMPLAINT -CIVIL ACTION

Toxic -Tort, Personal Injury, Negligence, Gross Negligence, Fraudulent Concealment

Plaintiff, pro se litigant, Josephine Jules, brings this lawsuit against Defendant. Plaintiff upon information and belief alleges as follows:

### THE PARTIES

1.      Plaintiff JOSEPHINE JULES ("Plaintiff") was a resident of the County of New York, City and State of New York on September 11, 2001 through on or about the third week of March 2002, after which she immigrated to Sweden. Plaintiff later returned to the United States as a graduate student between 2022 and 2024, during which time she sought medical evaluation and treatment alleged herein; during that time Plaintiff was temporarily present in the United States and did not alter her Swedish domicile.

2.      That at all times herein mentioned, Defendant CITY OF NEW YORK, (the "City" and "City of New York") was and still is a municipal domestic corporation duly organized and existing under the Laws of the State of New York and the New York City Charter. At all relevant times, the City acted by and through its departments, offices, agencies, employees, commissioners, servants, representatives, component agencies, and other agents, each acting within the scope of actual, apparent, implied, or explicit authority and employment. Pursuant to New York City Charter § 396 all such acts and omissions are legally chargeable to the City;  no municipal department or agency is named as a separate defendant.

3.      That at all times herein mentioned, DR. REBECCA FLORSHEIM, M.D., and DR. YEVGENIYA MOGILEVSKAYA, D.O., and DR. BENO OPPENHEIMER, M.D., and MARK FARGAS are physicians or technicians who treated or otherwise participated in care of the Plaintiff at NEW YORK CITY HEALTH AND HOSPITALS or WORLD TRADE CENTER ENVIRONMENTAL HEALTH CENTER or NYC HEALTH AND HOSPITALS CORPORATION BELLEVUE or HEALTH + HOSPITALS WTC CLINIC, and other physician who treated or otherwise participated in care of the Plaintiff at THE MAZANKOWSKI ALBERTA HEART INSTITUTE or PETER MUNK CARDIAC CENTER or KAROLINSKA UNIVERSITY HOSPITAL. They are mentioned in this pleading solely to describe the medical care and treatment provided. They are not named as defendants, and no relief is sought from them in this action.

4.      For ease of reference, the term "Non-Party Medical Providers" means Dr. Rebecca Florsheim, M.D., Dr. Yevgeniya Mogilevskaya, D.O., Dr. Beno Oppenheimer, M.D., Mark Fargas, New York City Health and Hospitals, World Trade Center Environmental Health Center, NYC Health and Hospitals Corporation Bellevue, Health + Hospitals WTC Clinic, The Mazankowski Alberta Heart Institute, Peter Munk Cardiac Center, Karolinska University Hospital. They are not named as defendants, and no relief is sought from them in this action.

5.      That prior to the commencement of this action, on or about December 13, 2023, and within the time prescribed by law, a sworn Notice of Claim stating inter alia the nature of the claim, the time and place where injuries were sustained as far as then practicable; and the claim for injuries the damages herein set forth and upon which this action is founded, together with Plaintiff's demands for adjustment thereof was duly served on the Plaintiff's behalf on the City, and that thereafter the City refused or neglected for more than thirty (30) days and up to the

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

commencement of this action to make any adjustment or payment thereof, and that thereafter and within the time provided by law this action was commenced.

6.      That on June 18, 2024, and July 8, 2024, and July 17, 2024, pursuant to General Municipal Law a 50-H hearing was taken by Joseph Hopkins, Pellis Law Group LLP, via Zoom.

7.      That this action is being commenced within one year and ninety days after accrual of this cause of action, or within the time allowed by law.

8.      Nothing in paragraphs 9 through 25 is intended to assert any cause of action against the Non-Party Medical Providers.

9.      That at all times herein mentioned, the WORLD TRADE CENTER ENVIRONMENTAL HEALTH CENTER (hereinafter "HEALTH + HOSPITALS WTC CLINIC") was and is a clinical center that operates under its parent organization NEW YORK CITY HEALTH AND HOSPITALS CORPORATION a public benefit corporation duly organized and existing under and the Laws of the State of New York; NYC Health + Hospitals Bellevue and WTC Environmental Health Center are not defendants.

10.      That at all times herein mentioned, REBECCA FLORESHEIM, M.D. was and still is a physician duly licensed by the State of New York and held herself out to the general public, and in particular to Plaintiff as a physician offering professional services and medical care and treatment.

11.      That at all times herein mentioned, REBECCA FLORESHEIM, M.D. was an employee of HEALTH + HOSPITALS WTC CLINIC.

12.      That at all times herein mentioned, REBECCA FLORESHEIM, M.D. was an agent of HEALTH + HOSPITALS WTC CLINIC.

13.      That at all times herein mentioned, REBECCA FLORESHEIM, M.D. was an attending physician at HEALTH + HOSPITALS WTC CLINIC.

14.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. held herself out to Plaintiff as acting on behalf of HEALTH + HOSPITALS WTC CLINIC.

15.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. held herself out to Plaintiff as a physician qualified to practice medicine.

16.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. held herself out to Plaintiff as a physician qualified to practice medicine in the field of Pulmonology.

17.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. received compensation for the services rendered to Plaintiff.

18.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. managed, maintained and supervised the medical care of Plaintiff.

19.      That at all times herein mentioned, REBECCA FLORSHEIM, M.D. had a physician patient relationship with the plaintiff and owed a duty to the plaintiff.

20.      That at all times herein mentioned, New York City Health and Hospitals Corporation,  operated, controlled, and managed a medical facility, by its agents, servants and employees pursuant to the laws of the State of New York for the care of the sick, generally known as NYC HEALTH AND HOSPITALS CORPORATION BELLEVUE inclusive of clinical program World Trade Center Environmental Health Center (hereinafter "HEALTH + HOSPITALS WTC CLINIC") at the location of 462 1st Avenue, MANHATTAN, NY 10016 which provided personnel, including doctors, nurses, attendants and others for the care and

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

treatment of its patients and which held itself out to the public as furnishing treatment facilities where patients, including the Plaintiff, could be treated.

21.     That at all times herein mentioned, HEALTH + HOSPITALS WTC CLINIC held itself out to the public, and more particularly to Plaintiff, as utilizing and employing medical personnel possessing the proper degree of learning and skill, and it undertook the duty to use reasonable care and diligence in the treatment of Plaintiff.

22.     That at all times herein mentioned, REBECCA FLORSHEIM, M.D rendered services to Plaintiff in the nature of medical diagnosis, care and treatment.

23.     That at all times herein mentioned, HEALTH + HOSPITALS WTC CLINIC by and through its employees, personnel, physicians, nurses, assistants, agents and/or partners, was managing the medical care of Plaintiff.

24.     That at all times herein mentioned, HEALTH + HOSPITALS WTC CLINIC by and through its employees, personnel, physicians, nurses, assistants, agents and/or partners, maintained, supervised and controlled the care of the Plaintiff.

25.     That at all times herein mentioned, HEALTH + HOSPITALS WTC CLINIC owed a duty to the plaintiff.

**JURISDICTION AND VENUE**
**SUBJECT-MATTER JURISDICTION**

26.     The United States District Court for the Southern District of New York has exclusive jurisdiction over any lawsuits related to September 11, 2001, terrorist attack(s). This Court possesses original, exclusive subject-matter jurisdiction over this negligence claim arising out of the September 11, 2001 WTC terrorist attack(s), and this cause of action is the exclusive remedy.

27.     This action seeks relief for latent personal injuries arising from the terrorist-related aircraft crashes September 11, 2001. This court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action "arises under" § 408(b)(1)-(3) of the Air Transportation safety and System Stabilization Act of 2001 ("ATSSSA"), Pub. L. 107-42, 115 Stat. 230. Section 408(b)(1) creates a federal cause of action for "any claim [..] resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001," and § 408(b)(3) mandates that the United States District Court for the Southern District of New York have "original and exclusive jurisdiction" over "all actions for any claim (including any claim for loss of property, personal injury or death) resulting from or relating to" the terrorist-related aircraft crashes of September 11, 2001.

28.     In the alternative, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because Plaintiff is a natural person domiciled in the Kingdom of Sweden, where her children—citizens of Sweden are also domiciled. Plaintiff immigrated to Sweden on or about the third week of March 2002, is registered in the Swedish Folkbokföring population registry— Plaintiff holds Canadian citizenship—holds no U.S. passport or U.S. lawful-permanent-resident status— confirming her foreign domicile. Plaintiff has no present intention of residing in any U.S. state. Plaintiff is therefore a "citizen or subject of a foreign state" for purposes of 28 U.S.C. § 1332(a)(2). Defendant City of New York is a municipal corporation organized under the laws of, and having its principal place of business in, the State of New York, and therefore a citizen of

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

New York under 28 U.S.C. § 1332(c)(1). Plaintiff seeks monetary **relief in an amount that exceeds $75,000 exclusive of interest and costs**.

29.      Because this controversy is between a citizen of a foreign state and a New York citizen and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, this Court possesses original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), **independent** of  jurisdiction conferred by the Air Transportation Safety and System Stabilization Act (ATSSSA).

30.      Jurisdiction is determined as of the filing of this amended complaint. *See Grupo Dataflux v. Atlas Global Group, 541 U.S. 567 (2004).*

### VENUE

31.      Venue lies exclusively in this Court under § 408(b)(3) of the Air Transportation Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101 note*,* which vests the United States District Court for the Southern District of New York with original and exclusive jurisdiction over any action "resulting from or relating to the September 11, 2001 terrorist-relates aircraft crashes."

32.      In the alternative, venue is also proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because the Defendant resides in this District and a substantial portion of the events and acts and omissions giving rise to the claim occurred within the counties that comprise the Southern District of New York.

### FACTUAL BACKGROUND

### A.  Plaintiff's Medical History (2015-2021)

33.      Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

34.      Nothing in paragraphs 35 through 41 is intended to assert any cause of action against the Non-Party Medical Providers.

35.      Upon documentary evidence, on or about around May 27, 2015, in Edmonton, Alberta Canada, Plaintiff at appeared to be a perfectly very fit and physical healthy on presentation with a 20.1 BMI.

36.      Upon documentary evidence, about the time of July 2015, in Edmonton, Alberta, Canada, at THE MAZANKOWSKI ALBERTA HEART INSTITUTE plaintiff was diagnosed and received care and treatment for Left-Ventricular non-compaction Cardiomyopathy (LVNC) now referred to as Nonischemic Cardiomyopathy (NICM).

37.      On information and belief, Plaintiff was threatened with a heart catheter procedure by her cardiologist because of her incessant complaining about inter alia terrible stabbing pains in her chest and chest tightness when he asked her on two (2) different occasions "We've done all the tests, do you want a catheter procedure?"

38.      Upon documentary evidence, in August 2016, at the PETER MUNK CARDIAC CENTER in Toronto, Ontario, Canada, Plaintiff received care and treatment for her heart muscle diagnosis after she requested a transfer to said facility.

39.      On information and belief, in the year 2019, in Ontario, Canada, Plaintiff's then doctor told her that a heart transplant is not needed.

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

40.    Upon documentary evidence, on or about September 2019, at KAROLINSKA UNIVERSITY HOSPITAL Heart and Vascular Clinic, in Stockholm, Sweden, plaintiff was treated for same "mild" heart muscle issue NICM.

41.    Upon documentary evidence, Plaintiffs illnesses were not apparent to the Plaintiff or her physicians in Canada and Sweden. The Plaintiff was told by her doctors that she was suffering from 'left-ventricular non-compaction cardiomyopathy' now referred to as nonischemic cardiomyopathy (NICM).

42.    During 2022, the Plaintiff returned to the United States to work on a graduate degree.

**B. Misdiagnoses and False Diagnoses (2022-2024)**

43.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

44.    Nothing in paragraphs 45 through 59 is intended to assert any cause of action against the Non-Party Medical Providers.

45.    Upon ~~documentary evidence~~ information and belief, on or around the time of November 4, 2022, Plaintiff performed a Pulmonary Function Test at HEALTH + HOSPITALS WTC CLINIC.

46.    Upon ~~documentary evidence~~ information and belief, on or about the time of November 21, 2022, plaintiffs physician DR: REBECCA FLORSHEIM M.D. told the plaintiff that her diagnostic Pulmonary Function Test ("PFT') was "normal", and on a subsequent phone call, blamed plaintiffs mild 'heart condition' as causal to feeling like she was not getting proper air.

47.    Upon information and belief, during telephone conversation with said physician, the plaintiff stated that the PFT test was missing data and pages.

48.    Upon information and belief, on or about December 7, 2022, during a phone call said physician attributed plaintiff's symptoms to her 2015 'mild' heart muscle diagnosis and then diagnosed her with "Asthma" upon which plaintiff immediately denied having 'Asthma', after which Dr. Rebecca Florsheim M.D then suggested that a Cardiology and ENT evaluation "be considered" for her issue with swallowing.

49.    Plaintiff then suggested further testing with specialists and asked for a second opinion, but said physician argued against it and told plaintiff that any second opinion would be scheduled with 'her' because there were only two (2) pulmonologists that Plaintiff  could see and 'said physician' was one of them. Plaintiff asked if she was 'joking' or being 'flippant' and said physician answered, "No."

50.    Upon ~~documentary evidence~~ information and belief, plaintiffs' physician REBECCA FLORSHEIM M.D employee and agent of HH BELLEVUE HOSPITAL WTC CLINIC with purposeful intent diagnosed Plaintiff as suffering from "Obstructive Airway Disease" specificity Asthma and "Upper Respiratory Disease" specificity Chronic Rhinosinusitis that said physician knew or should have known was patently false.

51.    Upon ~~documentary evidence~~ information and belief, on or around the time of December 2022, Plaintiff's physician Rebecca Florsheim M.D and employee and agent of HH BELLEVUE HOSPITAL WTC CLINIC with purpose erroneously and falsely diagnosed or

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

misdiagnosed the plaintiff as having "Upper Respiratory Disease" specificity Chronic Rhinosinusitis which was relied upon by plaintiff's doctors to her detriment.

52.    Plaintiff called HEALTH + HOSPITALS WTC CLINIC and was again told that she could only see DR. REBECCA FLORSHEIM M.D. When Plaintiff insisted that she had a 'right' for a second opinion HEALTH + HOSPITALS WTC CLINIC relented. Plaintiff then told Dr. Rebecca Florsheim M.D that she was going to book an appointment for a second opinion and said physician then stated that they would only give a referral to a pulmonologist who is a World Trade Center authorized physician, in essence a "partner-physician".

53.    ~~Upon documentary evidence, on~~ February 13, 2023, Plaintiff had an appointment with WTC-Partner-physician YEVGENIYA MOGILEVSKAYA, D.O. (hereinafter "WTC Partner-physician").

54.    ~~Upon documentary evidence, on~~ March 7, 2023, Plaintiff performed a pulmonary function test at WTC Partner-physician facility, and the test's diagnostic 'ranges' were without a medical basis manipulated outside of the 'standard range' on key diagnostic indicators (total 32% deviation and manipulation of industry 'standard range' for the "VC"), and diagnosed Obstructive Airway-Asthma, that WTC-Partner-physician knew or should have known was patently false.

55.    ~~Upon documentary evidence, on~~ March ~~15,~~ 2023, WTC Partner-physician ordered a lung CT scan.

56.    ~~Upon documentary evidence~~ Plaintiffs April 14, 2023, CT scan adhered to WTC best practices for diagnosis of ILD with consideration of paired expiratory and prone imaging.

57.    Upon ~~documentary evidence~~, after the April 14, 2023, CT scan, plaintiffs WTC Partner-physician stated to Plaintiff concerning her lungs "everything looks good" which was patently false—which said physician knew or should have known.

58.    Upon ~~documentary evidence~~ information and belief ,on or about June 6, 2023, the plaintiff asked Dr. Rebecca Florsheim M.D if she had looked at the plaintiff's CT scan, but said physician denied an ability to access said scan and agreed that plaintiff would bring a physical copy of said scan for physician to review at plaintiffs next appoint scheduled for September 12, 2023.

59.    Upon ~~documentary evidence~~ information and belief, on or about September 10, 2023, Dr. Rebecca Florsheim M.D: (a) cancelled the Plaintiffs appointment, which resulted in said doctor not viewing Plaintiffs CT scan images, and (b) scheduled a future appointment to occur an additional four (4) months into the future, which was over seven (7) months from when Dr. Rebecca Florsheim M.D had agreed to look at plaintiff's CT scan images.

## C. Obstruction of Care

60.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

61.    Nothing in paragraphs 62 through 71 is intended to assert any cause of action against the Non-Party Medical Providers.

62.    Upon ~~documentary evidence~~ information and belief, Plaintiff asked for a referral to see a specific lung specialist and REBECCA FLORSHEIM M.D agreed to provide the referral.

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

63.     Upon ~~documentary evidence~~ information and belief, on or about September 18, 2023, REBECCA FLORSHEIM M.D stated to Plaintiff that an external referral was placed.

64.     Upon ~~documentary evidence~~ information and belief on or about September 18, 2023, REBECCA FLORSHEIM M.D both called the Plaintiff and wrote the same in MyChart message to Plaintiff upon which the Plaintiff relied on.

65.     Upon ~~documentary evidence~~ information and belief, at around the time of 9:59 AM, on October 10, 2023,  Plaintiff called HEALTH + HOSPITALS WTC CLINIC and requested that they or REBECCA FLORSHEIM M.D provide the referral to the external doctor's office because the Plaintiffs appointment was scheduled for Oct 12, 2023, and the next available appointment was roughly six (6) months in the future.

66.     On or about October 10, 2023, when the external doctor's office contacted HEALTH + HOSPITALS WTC CLINIC to retrieve the referral on behalf of the Plaintiff it was denied.

67.     Upon information and belief, on or about October 10, 2023, not only did HEALTH + HOSPITALS WTC CLINIC and employee REBECCA FLORSHEIM M.D not provide the referral that was previously stated to have been provided, in addition, said parties provided erroneous and/or false information to Plaintiff's potential doctor.

68.     Upon ~~documentary evidence~~ information and belief, REBECCA FLORSHEIM M.D. did not make a referral to the Pulmonologist specialist as she claimed to have done.

69.     Upon ~~documentary evidence~~ information and belief, REBECCA FLORSHEIM M.D employee and agent of HEALTH + HOSPITALS WTC CLINIC while acting as Plaintiff's physician manufactured erroneous and/or false diagnoses and/or misdiagnoses that were relied upon by other medical doctors to the detriment of  Plaintiff.

70.     Upon ~~documentary evidence~~ information and belief, REBECCA FLORSHEIM M.D. employee and agent of HEALTH + HOSPITALS WTC CLINIC while acting as Plaintiff's physician purposefully obstructed with Plaintiff's medical care and diagnosis and treatment, and as a result caused irreparable harm including but not limited to a rapidly progressing cascade of illnesses "death spiral" and prolonged suffering mental and emotional anguish, and trauma.

71.     Upon ~~documentary evidence~~ information and belief, Both WTC Partner-physician and REBECCA FLORSHEIM M.D employee and agent of HEALTH + HOSPITALS WTC CLINIC while acting as Plaintiff's physician, concealed plaintiffs illnesses and obstructed with her medical care, diagnoses and treatment(s) for the purpose of concealing ~~serious latent injuries threatening to shorten her life and afflict her remaining years,~~ such causal to inter alia a prolonged and increased mental suffering and distress and anxiety, stress, mental anguish; and fear of harm and her own safety caused by the significant extent of subterfuge, damage and purposeful harm including: failure of adequate care and treatment, multiple false diagnoses, purposeful misinformation in her medical reports, a perpetrated broader conspiracy engaging multiple actors on multiple fronts for the purpose of ensuring that Plaintiff's illnesses remain unknown for nefarious reasons including mitigating the fallout of costs, further exposure, all of which inter alia has caused Plaintiff immeasurable harm, pain and suffering.

## D. Altered Medical Records

72.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

73.    Nothing in paragraphs 74 through 93 is intended to assert any cause of action against the Non-Party Medical Providers.

74.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. was an employee of HEALTH + HOSPITALS WTC CLINIC-

75.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. was an agent of HEALTH + HOSPITALS WTC CLINIC.

76.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. held himself out to Plaintiff as acting on behalf of HEALTH + HOSPITALS WTC CLINIC.

77.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. held himself out to Plaintiff as a physician qualified to practice medicine.

78.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. held himself out to Plaintiff as a physician qualified to practice medicine in the field of Pulmonology.

79.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. received compensation for the services rendered to Plaintiff.

80.    That at all times herein mentioned, BENO OPPENHEIMER, M.D. owed a duty to the plaintiff.

81.    That at all times herein mentioned, MARK FARGAS was an employee of HEALTH + HOSPITALS WTC CLINIC.

82.    That at all times herein mentioned, MARK FARGAS was an agent of HEALTH + HOSPITALS WTC CLINIC.

83.    That at all times herein mentioned, MARK FARGAS held himself out to Plaintiff as acting on behalf of HEALTH + HOSPITALS WTC CLINIC.

84.    That at all times herein mentioned, MARK FARGAS held himself out to Plaintiff as qualified and duly licensed to conduct the Pulmonary Function Test.

85.    That at all times herein mentioned, MARK FARGAS received compensation for the services rendered to Plaintiff.

86.    That at all times herein mentioned, MARK FARGAS and HEALTH + HOSPITALS WTC CLINIC owed a duty to the plaintiff.

87.    Upon documentary evidence, on August 29, 2024, Plaintiff was to perform a Pulmonary Function Test including but not limited to lung volumes and DLCO, at HEALTH + HOSPITALS WTC CLINIC.

88.    On August 29, 2024, at around the time of 2:24 P.M at HEALTH + HOSPITALS WTC CLINIC Plaintiff performed a Pulmonary Function Test (hereinafter "AUG2024 PFT").

89.    Upon ~~documentary evidence~~ information and belief, MARK FARGAS was the technician who conducted plaintiff's AUG2024 PFT.

90.    Upon ~~documentary evidence~~ information and belief, DR. BENO OPPHEIMMER interpreted the AUG2024 PFT diagnostic data and is the author and doctor of record on the report.

91.    Upon ~~documentary evidence~~ information and belief, HEALTH + HOSPITALS WTC CLINIC employees and agents DR. BENO OPPHEIMMER and MARK FARGAS inter alia altered, falsified, fraudulently manipulated, doctored and concealed data and information that would be relied upon for the care and diagnosis of Plaintiff's injurious diseases.

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

92.     Upon ~~documentary evidence~~ information and belief, said employees and agents
DR. BENO OPPHEIMMER and MARK FARGAS (1) altered data material to diagnosis and
fraudulently submitting it as a factual record of Plaintiffs performance; (2) falsified and/or
destroyed and/or modified medical records (3) erased from medical record a generated
"Pulmonary Function Visit in Bellevue Pulmonary Function 'CANCER STAGING REPORT';
(4) purposefully added into record a breast cancer diagnosis replete with biopsy; (5) doctored
and/or manipulated data; (6) modified and/or doctored and/or manipulated results, (7) provided
erroneous and/or false data, (8) reported erroneous and/or false results, (9) poisoned Plaintiff's
medical records causing the plaintiff to suffer inter alia mental pain and anguish, emotional and
physical suffering and irreparable harm.

93.     Upon ~~documentary evidence~~ information and belief, employees and agents DR.
BENO OPPHEIMMER and MARK FARGAS inter alia provided inaccurate results of plaintiff's
performance and inaccurate diagnostic information concerning Plaintiff's lungs, that was relied
upon for diagnoses and treatment and medical care to her detriment and harm.

94.     Said occurrence(s) occurred without any fault or wrongdoing on the part of the
plaintiff contributing thereto.

**E. Latent Injuries Manifested**

95.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if
fully stated herein.

96.     Upon ~~documentary evidence~~ information and belief, Plaintiff while living in the
WTC '~~high-~~exposure zone' was by the acts and omissions and admissions of the City of New
York caused to suffer exposure(s) and inhalation(s) of WTC toxic environmental contaminants,
hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and
fumes In excess of 181 days, the Plaintiff suffered over four thousand three hundred and forty
four (4,344 ) hours of exposure(s) and inhalation(s).

97.     Upon on information and belief, Plaintiff notice of manifestation of latent
injurious disease began to occur around the time of the middle of October 2023.

98.     Upon ~~documentary evidence~~ information and belief, Plaintiff did not become
aware that living at the periphery of the WTC disaster site had caused Interstitial Lung
Abnormalities until about the time of middle of October 2023.

99.     Upon information and belief, Plaintiff notice of manifestation of other latent
injurious diseases began to occur on or about late October 2023 and late January 2024.

100.     Upon ~~documentary evidence~~ information and belief, on April 25, 2024, Plaintiff
became aware that living in the 'high-exposure zone' has caused her to suffer multiple latent
bodily injuries including ~~but not limited to:~~RESTRICTIVE LUNG DISEASE, EARLY-
INTERSTITIAL LUNG DISEASE (ILD)- INTERSTITAL LUNG ABNORMALITIES(ILA)
upon results of  her CT2023 scan and diagnostic serology plaintiff was diagnosed as suffering
latent injury Lung Disease, "Interstitial Lung Disease(ILD) in its infancy" "ILA-ILD" caused as
a result of exposure(s) to and inhalation(s) of  WTC toxic environmental contaminants,
hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and
fumes, in the '~~high-~~exposure zone' where she lived.

101.     Upon ~~documentary evidence~~ information and belief, on April 25, 2024, Plaintiff
became aware that living in the '~~high-~~exposure zone' has caused her to suffer serious multiple

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

latent injuries including ~~but not limited to~~: NEW-ONSET RHEUMATOLOGIC SYSTEMIC AUTOIMMUNE disease. Upon results of plaintiffs JAN 2024 diagnostic serology, symptoms and diagnostic tools, plaintiff was diagnosed as suffering from latent injury new-onset rheumatologic systemic autoimmune disease caused as a result of exposures(s) to and inhalation(s) of WTC toxic environmental contaminants, hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the '~~high~~ exposure zone' where she lived.

102.    Upon information and belief, Plaintiffs awareness of the manifestation and symptoms of other latent disease(s), began to occur around the time of June and July 2024.

103.    Upon ~~documentary evidence~~ information and belief, around the time of July and August 2024, Plaintiff became aware that living in the '~~high~~ exposure zone' has caused her to suffer additional serious multiple latent bodily injuries including ~~but not limited to~~: CEREBROVASCULAR ACCIDENT (CVA) LACUNAR INFARCT consistent with mixed connective tissue disease (MCTD), CEREBRAL SMALL VESSEL DISEASE, MICROANGIOPATHIC ISCHEMIC DISEASE, lesion extending on each side of the falx-MENINGIOMA, latent injurious diseases, diagnosed upon results of plaintiffs diagnostic MAY 1, 2024 MRI BRAIN W WO CONTRAST, that to a high degree of scientific probability and plausibility caused as a result of exposures(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances, and environmental toxicants including, ~~but not limited to,~~ toxic dust and fumes, in the '~~high~~ exposure zone' where she lived.

104.    Upon ~~documentary evidence~~ information and belief, beginning on or about September 2024, Plaintiff became aware that living in the '~~high~~ exposure zone' has caused her to suffer additional latent injuries including ~~but not limited to~~: NEW-ONSET CARDIAC LATE GADOLINIUM ENHANCEMENT (LGE), upon results of March 19, 2024 MRI Cardiac detection of LGE that to a degree of scientific probability and plausibility is a Sarcoidosis latent injury caused as a result of exposures(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the '~~high~~ exposure zone' where she lived.

105.    Upon ~~documentary evidence~~ information and belief, in September 2024, Plaintiff became aware that living in the '~~high~~ exposure zone' has caused her to suffer additional latent injuries including ~~but not limited to~~: HEPATIC STEATOSIS- TOXICANT -ASSOCIATED FATTY LIVER DISEASE, upon results of her SEPT 2024 Abdomen Ultrasound plaintiff was diagnosed as suffering from Hepatic steatosis, that to a high degree of scientific probability and plausibility is suggestive of toxicant associated fatty liver disease injury consistent with WTC chemical exposures known to cause liver toxicity environmental chemical exposures including ~~but not limited to~~ PFAS, PCSs and dioxin toxicant associated fatty liver disease, caused as a result of exposure(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in '~~high~~ exposure zone' where she lived.

106.    Upon ~~documentary evidence~~ information and belief, in October 2024, Plaintiff was diagnosed as suffering from BRONCHIECTASIS latent injurious disease, that to a high degree of scientific probability and plausibility caused as a result of exposure(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the '~~high~~ exposure zone' where she lived.

107.    Upon documentary evidence, in November 2024, Plaintiff became aware that living in the '~~high~~ exposure zone' has caused her to suffer additional serious latent injuries

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

including ~~but not limited to~~: MYOSITIS, NEW -ONSET AUTOIMMUNE RHEUMATIC DISEASE, AUTOIMMUNE SMITH/RNP (ENA) Antibody IgG-specificity for systemic autoimmune rheumatic disease MYOSITIS and IDIOPATHIC INFLAMMATORY MYOPATHIES (IIM), MIXED CONNECTIVE TISSUE DISEASE (MCTD) and/or CONNECTIVE TISSUE DISEASE (CTD) and/or UNDIFFERENTIATED CONNECTIVE TISSUE DISEASE; Systemic Inflammation, Allergic Responses, Allergic Reactions, Cellular Dysfunction, upon April 25, 2024 diagnosis of new-onset rheumatologic systemic autoimmune disease, and January 2024 and November 2024 diagnostic serology including ~~but not limited to~~ November 2024 Myositis Specific Antibodies (MSA) U1/RNP (ENA) Ab, IgG also known as Anti-RNP positive clinical association central to and diagnostic of mixed connective tissue diseases (MCTDs); upon March 2025 to May 2025 HEMOPTYSIS episodes and March 26, 2025 ANTI-SYNTHETASE serology and symptoms central to and diagnostic of autoimmune Anti-synthetase ASyS, including ~~but not limited to~~: pulmonary involvement, strong positive PL-7 MSA, Raynaud's, Mechanics Hands, and pulmonary involvement, that to a high degree of scientific probability and plausibility caused as a result of exposure(s) and inhalation(s) of WTC toxic environmental contaminants and hazardous substances and environmental toxicants, including, ~~but not limited to~~, toxic dust and fumes in the '~~high-~~exposure zone' where she lived.

108. Said occurrence(s) occurred without any fault or wrongdoing on the part of the plaintiff contributing thereto.

### F. World Trade Center Exposure Background

109. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

110. This action arises out of Plaintiff's latent toxic-exposure(s) to and inhalation(s) of WTC toxic environmental contaminants, hazardous substances, and environmental toxicants, including but not limited to toxic dust and fumes, arising out of the terrorist-related aircraft crashes of September 11, 2001 and subsequent collapse of the World Trade Center Towers and buildings in the World Trade Center complex.

111. Plaintiff subsequently developed latent personal injuries proximately caused by the negligence, gross negligence, and reckless disregard of the City of New York following the terrorist-related aircraft crashes of September 11, 2001 and subsequent collapse of the World Trade Center Towers and buildings in the World Trade Center complex. Plaintiff brings this claim under § 408(b)(1) of the Air Transportation Safety and System Stabilization Act (49 U.S.C. § 40101 note). Pursuant to § 408(b)(2) of the ATSSSA, the substantive law governing this action is derived from New York law unless inconsistent with federal law.

112. At all relevant times herein, Plaintiff JOSEPHINE JULES ("Plaintiff") resided in Apartment 2904 of 100 John Street, New York, New York, (abutting Gold Street) on and after September 11, 2001, up to on or about the third week of March 2002, approximately five hundred (500) meters more or less from the World Trade Center Disaster site—Ground Zero—affording Plaintiff an unobstructed direct line of sight to the North Tower and sight of South Tower prior to and during the terrorist attacks of September 11, 2001, and thereafter to exposure(s).

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

113.    At all relevant times herein, including on or about September 11, 2001, Plaintiff was pregnant with child *in utero* while living well within the ≤ 0.5 km "high-exposure" band recognized by EPA and subsequent medical literature.

114.    Pursuant to the authority granted him under the Executive Law of New York, N.Y. Exec. Law § 24, the Mayor of The City of New York, Rudolph W. Giuliani, issued a Mayoral Order on September 11, 2001, proclaiming a local state of emergency based on the danger to public safety posed by the attacks. In declaring a state of emergency, the Mayor directed "the Police, Fire and Health Commissioners and the Director of Emergency Management to take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City." Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (September 11, 2001). In re World Trade Center Disaster Site Litigation, 456 F.Supp.2d 520, 527 (S.D.N.Y., 2006).

115.    Upon ~~documentary evidence~~ information and belief, immediately following the terrorist-related aircraft crashes on September 11, 2001, Defendant CITY OF NEW YORK ( "City") assumed control of the WORLD TRADE CENTER site (hereinafter "WTC") through the CITY OF NEW YORK MAYOR'S OFFICE OF EMERGENCY MANAGEMENT (the "NYC OEM") which as per Executive Order #30 had a plan to control the site.

116.    Upon ~~documentary evidence~~ information and belief, CITY OF NEW YORK DEPARTMENT OF DESIGN AND CONSTRUCTION (the "NYC DDC") assumed primary control over the site, established a command center and assumed control over all aspects  of safety, construction, demolition, and cleanup activities and collaborated with other City entities.

117.    Upon ~~documentary evidence~~ information and belief, on and about and after September 12, 2001, CITY OF NEW YORK MAYOR GIULIANI and CITY OF NEWYORK DEPARTMENT OF HEALTH (the "NYC DOH") made public statements including but not limited to that the air-quality is safe to breathe in what is known as the ~~high-~~exposure zone— false assertions and false reassurances that Plaintiff relied on as truth and fact and acted on, to plaintiff's detriment.

118.    Upon ~~documentary evidence~~ information and belief, on and about and for months after September 16, 2001, the City inter alia repeatedly issued false assertions that air-quality was of no detriment to health and provided assurances including encouraging residents, and the general public to return to residences and businesses in the WTC ~~high-~~exposure zone 'return to business as usual' while providing false assurances that the 'air-quality has been tested and deemed safe' and issued false assurances that pregnant women are not at a greater risk . In a televised press conference on September 28 2001, Mayor Giuliani reiterated that 'the air-quality is safe and acceptable,' falsely assuring the ~~public and~~ plaintiff the air-quality was of no detriment to health.

119.    Upon ~~documentary evidence~~ information and belief, CITY OF NEW YORK DEPARTMENT OF ENVIRONMENTAL PROTECTION (the "NYC DEP") assumed the lead role for "hazardous waste disposal" at the World Trade Center site, and monitoring the ambient air, water and drinking water and coordination of the sampling data, producing and disseminating reports which incorporated the results of environmental tests conducted at the site.

120.    Upon ~~documentary evidence~~ information and belief, on or about and months after September 16, 2001, the NYC DEP inter alia provided false assertions and assurances that

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

'people are safe' and 'there is no danger to anyone's health' false reassurances that were relied on and acted on as truth and fact to plaintiff's detriment.

121.    Upon ~~documentary evidence~~ information and belief, on or about and for months after September 12, 2001 the NYC DOH repeatedly made assertions and assurances including that the air-quality" was 'safe' and of no concern to ~~public~~ health, safe to reoccupy, and denied that air-quality was a detriment to health, such assertions and false reassurances that the Plaintiff acted on to her detriment.

122.    Upon ~~documentary evidence~~ information and belief, on or about and after October 5, 2001, the NYC DOH announced that the air "is below the level of public health concern and [does] not pose long-term health risks to the general public" false assertions and reassurances that the Plaintiff relied on as truth and fact and acted on to plaintiff's detriment.

123.    Upon documentary evidence, on or about October 5, 2001, NYC DOH received a letter date stamped "OCT 05 2001", from the U.S. Environmental Protection Agency that declared that the disaster site poses threats "related to exposure to hazardous substances and the sources of hazardous substances:(1) building materials from the destroyed buildings (2) hazardous materials that were stored in the buildings (refrigerants, hazardous wastes, ethylene glycol, compressed gas cylinders, etc.), and (3) products of combustion being emitted from the fires that continue to burn within the debris piles," yet continued to issued false reassurances that plaintiff relied on to her detriment.

124.    Upon documentary evidence, "prior to and on 9/11, information on the documented presence of toxic substances at the WTC site was available in government databases that itemize storage of hazardous raw materials, as per the hazardous chemical storage reporting requirements of the federal Emergency Planning and Community Right to Know Act. These data, readily available at the time, indicated at a minimum the probable presence of barium, lead, chloroform, chlordane, carbon tetrachloride, cadmium, chromium, mercury, hydrogen sulfide, arsenic, and other toxic raw materials at the offices of the United States Customs Service, 6 World Trade Center, and of mercury, tetrachloroethylene, PCBs, arsenic, ethane, and other toxic raw materials at 1 World Trade Center. The purpose of the hazardous raw materials databases is precisely to facilitate safe emergency response and effective containment and cleanup in the event of an unanticipated chemical release."

125.    Upon documentary evidence, "[a]dditional information on hazardous in-place building materials and office furnishings was widely known and was a prerequisite to appropriate preliminary risk assessment. An estimated 400 or more tons of asbestos had been utilized in sprayed-on fireproofing during the construction of the WTC towers. Additional unknown amounts of asbestos containing material were used in pipe insulation. The extensive use of asbestos at the WTC site was well documented prior to September 11, 2001. In 1971, while the WTC was still under construction, New York City passed Local Law 49, which banned the use of sprayed on fireproofing that contained asbestos, effective February 25, 1972. The 1993 bombing of the WTC again raised the issue of inadvertent releases of WTC asbestos during disaster events, and some WTC asbestos was removed. Thus, the City was aware and cognizant of the potential for the release of hundreds of thousands of pounds of asbestos into the ambient air during the collapse of the WTC towers on September 11, 2001."

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

126.    Upon documentary evidence, essential "[i]nformation about the potential for the release of additional toxic substances should have been intuitive. For example, computers and computer components contain significant amounts of lead. It can be conservatively estimated that there were greater than 10,000 personal computers in the WTC complex, each containing 4 or more pounds of lead, as well as numerous mainframe computers and servers. Consequently, it is likely that at least 40,000 pounds of lead were released into the general environment on 9/11, and very possibly a substantially larger amount."

127.    "Similarly, fluorescent light bulbs contain tiny but environmentally significant amounts of mercury. Estimates of the amount of mercury in a single bulb range from 3 milligrams to 21 milligrams. The presence of 500,000 fluorescent light bulbs in the WTC complex indicated that it was therefore possible that the amount of mercury released from fluorescent light bulbs only (and not including additional sources of mercury such as electric switches) ranged from 3 to 23 pounds. This is the approximate equivalent of 8% of the total daily mercury emissions from all coal-fired utility boilers in the United States or 26% of the daily mercury emissions from all municipal waste incinerators."

128.    Upon documentary evidence, credible, substantive data that indicated the presence of toxic substances in significant quantities at the WTC site were readily available prior to, and on, and after September 11, 2001. (See ¶¶ 123- 127, 129-131.)

129.    Upon documentary evidence, environmental sampling results available subsequent to September 11 indicated the presence of hazardous and toxic substances at levels of concern at the WTC disaster site and area, a serious detriment to health and safety.

130.    Upon documentary evidence, test results for dioxin in the ambient air September through late November 2001 within and near WTC disaster site, showed " unambiguous elevation" when compared to typical urban background levels. An EPA report noted that the concentrations within and near the WTC site are likely the highest ambient concentrations that have ever been reported. Such indicates that returning to the areas that were opened to the public as safe one week after 9/11 precipitated exposure to concentrations of dioxin " nearly six(6) times the highest dioxin level ever recorded in the U.S."  The air-quality was a serious detriment to health as dioxin exposure concentrations were between 100 and 1,500 times higher than typical in urban air.

131.    Upon documentary evidence, on November 8, 2001, an EPA grab sample at the North Tower plume detected 180,000 ppb of benzene–180 times above [sic] the OSHA limit.

132.    Upon documentary evidence, the City was fully aware of the dangers of air based toxins and failure to act reasonably ~~to fulfill their obligations~~ to protect ~~public~~ Plaintiff's health caused foreseeable harm. The City knew or should have known the air-quality was a detriment to health as it had knowledge of the presence of toxic environmental contaminants, hazardous substances, hazardous materials, and environmental toxicants, including, but not limited to, toxic dust and fumes at the WTC site, and the severe health risks associated with exposure(s) and inhalation(s). (See ¶¶ 123- 131.)

133.    The City was fully aware of the dangers and detriment to health ~~of~~ exposure(s) and inhalation(s) cause, and failure to take reasonable measures to protect Plaintiff's ~~and the public~~ health caused foreseeable harm. (See ¶¶ 96-107, 123- 131.)

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

134.    Upon documentary evidence, in excess of three hundred and fifty (350) chemical, biological or other hazardous substances were present in the New York City disaster area. ~~that~~ Plaintiff was exposed to including but not limited to dioxins, PCBs, PFASs, PAHs. Despite such knowledge, the City inter alia failed to disclose toxic exposure risks and establish proper safety protocols ~~for residents~~. As a proximate result of the City's acts and omissions Plaintiff has suffered serious significant health complications, serious latent injuries and great bodily harm. (See ¶¶ 96-107, 123- 131.)

135.    The City had ~~legal duties and obligations including but not limited to~~ a duty of care to protect ~~public~~ health against exposure(s) to toxic environmental contaminants, hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, remediate environmental hazards, warn of known dangers, and mitigate risks associated with toxic exposure(s). The City breached its ~~legal~~ duties ~~and obligations~~ by acting ~~in a manner that evinced reckless and conscious disregard for public health and safety~~ negligently, to the detriment of ~~the~~ plaintiff.

136.    Defendant the City of New York breached its legal duties and obligations, including, but not limited to: its duty under the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, its obligation to attain and maintain the National Ambient Air Quality Standards of §§ 109-110, 42 U.S.C §§ 7409–7410, and its duty to limit emissions of hazardous air pollutants of § 112, 42 U.S.C. § 7412 by permitting excessive releases of particulate matter and other hazardous air pollutants; and violated its duty under the Asbestos National Emissions Standards for Hazardous Air Pollutants (Asbestos NESHAP) 40 C.F.R. Part 61, Subpart M, notification and practices for any demolition/renovation debris involving Regulated Asbestos-Containing Material (RACM); breached its statutory duty under § 103 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9603, and § 304 of the Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11004 to provide immediate notice to the National Response Center, the New York State Emergency Response Commission, and the New York City Local Emergency Planning Committee of any asbestos, lead, or dioxin, or other hazardous substances in amount equal to or exceeding its reportable quantities within any 24-hour period; breached its duty under Subtitle C of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6921 et seq., to identify, containerize, label and manifest hazardous debris in accordance with the statute's cradle-to-grave control of hazardous waste, and instead of shipped material as "clean fill"; breached its constitutional duty under the N.Y. Const. art. XVII § 3 duty to protect health to safeguard and protect the health of the people; breached its statutory duty to preserve, protect the public health, safety and welfare, and to prevent injury to humans—release of hazardous substances into the environment is a menace to the health, safety and welfare of the people of the city under New York City Air Pollution Control Code. N.Y.C. Administrative Code § 24-602; breached its statutory duties under New York City Air Pollution Control Code, N.Y.C Administrative Code §§ 24-141 (odorous contaminants), 24-142 (opacity standard), 24-146 (dust and asbestos controls); and breached its non-delegable statutory duty under New York City Charter § 556 (c)(2), to supervise the reporting and control of hazardous conditions and to abate public health nuisances; and, further, under Charter § 563, once the City's Board of Health possessed proof of a 'great and imminent peril' posed by toxic environmental contaminants and hazardous substances, it was

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

empowered—and, consistent with its public-health duties, obligated—to adopt and enforce such orders and regulations as it deemed necessary and proper to protect ~~the public~~ health. Defendant, the City of New York, inter alia, breached the forgoing statutes and regulations, thereby proximately causing severe and foreseeable bodily injury to Plaintiff.

137.    As this Court has recognized *in the similar matters*, exposure related injuries suffered at the World Trade Center and related sites following the September 11, 2001, attacks are largely latent injuries that do not assert themselves as such until months, years and decades after the pertinent exposures.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**NEGLIGENCE**

138.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

139.    That on and after September 11, 2001 up to on or about the third week of March 2002, Plaintiff JOSEPHINE JULES ("Plaintiff") resided in Apartment 2904 of 100 John Street, in New York City and State of New York

140.    That beginning on or about and for months after September 12, 2001 plaintiff relied on the Defendant CITY OF NEW YORK (the "City") false assertions and false assurances including the air-quality was safe to breathe and of no risk to ~~public~~ health where she lived in the WTC '~~high~~-exposure zone'~~(the "high-exposure zone"),~~' to plaintiff's detriment.

141.    That on or about and for months after September 17, 2001, as a result of the City's false assertions and reassurances including 'safe air-quality' and safe conditions to reoccupy, plaintiff reoccupied her Apartment, to plaintiff's detriment.

142.    Following the mandatory evacuation and re-occupancy of her residence, Plaintiff requested an inspection due to her apartments near-field location to the WTC site, her pregnancy, and concerns about air safety and health, thereafter a representative dispatched through a City - coordinated disaster response framework involving ~~from~~ the Federal Emergency Management Agency ("FEMA") visited Plaintiff's at her apartment ~~at~~ near the corner of Gold Street and John Street.

143.    The ~~FEMA~~ representative identified himself to Plaintiff as FEMA and acting in coordination with the City's post-9/11 environmental health and safety response ~~under federal local disaster frameworks,~~ conducted an inspection of Plaintiff's apartment ~~premises.~~

144.    During the visit, the ~~FEMA~~ representative (who identified himself as FEMA and acting in coordination with the City's post-9/11 environmental health and safety response) ~~directly stated~~ assured Plaintiff that there was no dust present, ~~assured Plaintiff~~ issued assurances of air safety that the air was safe to breathe and ~~stated~~ assured her that it was safe for her ~~Plaintiff~~ to continue living there (in the exposure zone).~~FEMA representative~~ and provided her ~~Plaintiff~~ with a small HEPA air machine (the size of a radio).

145.    No ~~actual~~ air quality test**ing** was performed ~~by FEMA~~ during the in-person visit to Plaintiff's ~~the~~ apartment unit, despite the representative's assurances of safety. Plaintiff reasonably relied on ~~this in-person~~ these personalized assurances ~~from FEMA (which was part of the joint federal-City efforts)~~ to her detriment, and ~~remaining~~ remained in the exposure zone ~~contaminated area~~ resulting in ~~and suffering~~ prolonged exposures to WTC environmental toxicants, contaminants and hazards.

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

146. These personalized assurances were negligent and contributed ~~contradicted known hazards including the EPA letter received by the City on or about October 5, 2001, contributing~~ to the City's breach of its duty of care ~~through misleading communications and failure~~ to ~~mitigate risks for~~ Plaintiff.

~~142~~147. That on or about and for months after September 17, 2001 because plaintiff relied on the City's false assertions and reassurances including but not limited to that there were no hazards to ~~public~~ health or concern for health, that the air-quality was 'safe' safe to breathe, and it was safe ~~for residents to return to their apartments~~, the City negligently failed ~~to protect public health and in failing~~ to take reasonable precautions to protect ~~individuals~~ her from exposure ~~in failing to preserve public safety and protect the well-being and public health of the public and residents in the area, and failure~~ to warn, plaintiff was caused to suffer exposure(s) to and inhalation(s) of WTC toxic environmental contaminants, hazardous substances, and environmental toxicants, including ~~but not limited to~~ toxic dust and fumes, and as a result plaintiff suffered serious latent injuries, threatening to shorten her life and afflict her remaining years.

~~143~~148. The City owed ~~the~~ Plaintiff ~~and others~~ a legal duty and obligations ~~including but not limited to owing~~ a duty of care to protect ~~public health~~ against exposure(s) to toxic environmental contaminants, hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, mitigate risks associated with toxic exposure(s), and warn of the exposure(s) and risks and air-quality hazards.

~~144~~149. That upon documentary evidence, prior to and ~~on~~ after September 11, 2001, the City had knowledge of the presence of hazardous materials at the WTC site and the severe health risks associated with exposure(s) and inhalation(s). (See ¶¶ 123- 131.)

~~145~~150. The City breached its ~~legal~~ duties ~~and obligations~~ by ~~acting with reckless and conscious disregard for public health and safety through inter alia~~ but not limited to: (1) failing to comply with applicable health and safety standards, regulations and guidelines (See ¶¶ 114-115, 123-124, 134-136, 148); (2) advising and falsely assuring ~~individuals including~~ Plaintiff to return to ~~areas that were~~ unsafe exposure zone and hazardous conditions despite knowing or having reason to know of the exposure hazards (See ¶¶ 117-132, 134, 141-147); (3) withholding facts material to safety risks ~~and well-being of~~ to plaintiff ~~residents of~~ in the area, (See ¶¶ 123- 131); (4) failing to warn and/or communicate risks (See ¶¶ 122-131); (5) acts and omissions described herein (See ¶¶ 114-118, 120-122, 124, 134-136, 142-149, 152, 165-168, 177-178); thereby proximately caused injury to plaintiff.

~~146~~151. As a direct and proximate cause of the City's negligence, plaintiff suffered serious latent injuries caused by the latent effects of exposure(s) including ~~but not limited to~~ Interstitial Lung Abnormalities, Interstitial Lung Disease, Lung Disease, Myositis, Mixed or Undifferentiated Connective Tissue Disease, new-onset Rheumatologic systemic Autoimmune disease, Anti-synthetase ASyS, Bronchiectasis, that to a high degree of scientific probability and plausibility a result of her exposure(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the 'high-exposure zone' where she lived. (*See* paras 100 to 111).

~~147~~152. The City knew and should have known exposure(s) and inhalation(s)to the hazardous conditions posed severe risks to ~~public~~ health and safety ~~of residents~~ in the 'high-

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

exposure zone'. Despite having said knowledge the City failed to take steps to prevent such exposure(s) and inhalation(s) or warn plaintiff ~~and the public~~ of associated risks. (See ¶¶ 123-124.)

~~148~~153.        That from on or about and for months after September 17, 2001, Plaintiff lived at the periphery of the WTC disaster site within the '~~high~~exposure zone' and suffered exposure(s) and inhalation(s) of WTC toxic environmental contaminants, hazardous substances and environmental toxicants, including~~, but not limited to~~ toxic dust and fumes, in excess of 181 days, over four thousand three hundred and forty four (4,344 ) hours of exposure(s) and inhalation(s).

 ~~149~~154.        The above-mentioned occurrence(s) and the results thereof, were caused by the negligence and carelessness of  the City.

 ~~150~~155.        Upon documentary evidence, The City Of  New York Chief Medical Officer, Special Advisor to the Commissioner on Health Policy, Director, World Trade Center Health Programs at FDNY admission of fact that evidence from epidemiologic studies demonstrate consistently strong statistically significant associations between WTC exposure and new-onset rheumatologic systemic autoimmune disease in Responders and Survivors like injuries like that suffered by the plaintiff, and such is unequivocally supported by peer-reviewed scientific studies in non-WTC cohorts, including some from the National Toxicology Program, that clearly demonstrate biological plausibility.

~~151~~156.        Upon documentary evidence, The City Of New York, Chief Medical Officer, Special Advisor to the Commissioner on Health Policy, Director, World Trade Center Health Programs at FDNY provided overwhelming scientific evidence and admission of fact that epidemiologic studies demonstrate consistently strong statistically significant associations between WTC exposure and new-onset cardiovascular diseases ~~including stroke~~ in Responders and Survivors, like injuries like that suffered by the Plaintiff and is further supported by peer - reviewed studies in non-WTC cohorts, some form the Environmental Protection Agency, the clearly demonstrate biological plausibility.

~~152~~157.        Thus, by the City's own Admissions of fact and submissions of overwhelming scientific evidence of inter alia: the pathophysiology and pathogenesis of exposure(s) to WTC toxins, environmental contaminants, hazardous substances, environmental toxicants and the disease(s) that scientifically and unequivocally demonstrates causation between the WTC exposure(s) and the disease(s); said scientific evidence scientifically demonstrates biological plausibility and is thus settled fact.

~~153~~158.        Said occurrence(s) and resulting injuries occurred without any fault or wrongdoing on the part of the plaintiff contributing thereto.

~~154~~159.        That by reason of the foregoing and the negligence and by the acts and omissions and admissions of the City, Plaintiff to a high degree of scientific probability and plausibility was caused to suffer great bodily harm and serious latent injuries that threaten to shorten her life and afflict her remaining years. Plaintiff permanently suffers from the injuries and their effects, requires ongoing medical care and treatment; and as a result of her injuries Plaintiff has been caused inter alia to suffer loss of quality and/or enjoyment of life, conscious pain and suffering, loss of income and diminished earning capacity, other economic damage, emotional distress and mental anguish, intentional and negligent inflictions of emotional distress, disfigurement, loss of

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

society and companionship, loss of consortium, hedonic damages, and all other non-pecuniary losses of any kind of nature, punitive damages, future medical expenses and any and all damages sustained a resultant loss therefrom to which claimant is entitled to pursuant to case law and statute.

## AS AND FOR A SECOND CAUSE OF ACTION:
## GROSS NEGLIGENCE

~~155~~160.        Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

~~156~~161.        This cause of action is distinct from ordinary negligence because it involves a higher degree of recklessness and willful disregard for Plaintiff's safety.

~~157~~162.        That upon documentary evidence, prior to and on and after September 11, 2001, the City had knowledge of the presence and nature of hazardous substances and hazardous materials at the WTC site and the severe health risks associated with exposure(s) and inhalation(s).

~~158~~163.        Upon documentary evidence, credible, substantive data that indicated the presence of toxic substances in significant quantities at the WTC site, such were readily available prior to and on and after September 11, 2001.

~~159~~164.        Upon documentary evidence information and belief, environmental sampling results available subsequent to September 11, 2001 and after, indicated the presence of toxic substances at levels of concern at the WTC disaster site and area.

~~160~~165.        Upon ~~documentary evidence~~ information and belief, on or about October 5, 2001, NYC DOH falsely reassured that the air "is below the level of public health concern and [does] not pose long-term health risks to the general public."

~~161~~166.        Upon documentary evidence, on or about October 5, 2001, NYC DOH received a letter date stamped "OCT 05 2001" from the U.S. Environmental Protection Agency that declared that the disaster site poses threats related to exposure to hazardous substances and the sources of hazardous substances:(1) building materials from the destroyed buildings (2) hazardous materials that were stored in the buildings (refrigerants, hazardous wastes, ethylene glycol, compressed gas cylinders, etc.), and (3) products of combustion being emitted from the fires that continue to burn within the debris piles.

~~162~~167.        ~~Upon documentary evidence~~ The City repeatedly with conscious and willful disregard for Plaintiff's safety, engaged in conduct that was grossly negligent, careless and reckless ~~failing to take reasonable measures to protect Plaintiff's and the public health~~ including but not limited to: (1) ~~failing~~ failed to disclose ~~any extent of~~ toxic exposure(s) in the 'exposure zone' ~~(2) failing to disclose material facts (3)~~ (2) willful ~~concealment~~ concealed ~~of~~ material facts concerning ~~the health and~~ Plaintiff's safety ~~of individuals (4) withheld critical health information (5)~~ (3) made material misrepresentations of facts including but not limited to air quality safety and toxic environmental contaminants and hazardous substances exposure(s) ~~and,(6) had~~ while having knowledge or ~~should~~ reason to have known of its falsity; ~~(7)~~ (4) repeatedly made false representations of material facts knowing that there were severe health risks associated with the exposure(s) and inhalations(s);~~( 8)~~ and (5) implemented unsafe clean up measures.

~~163~~168.        The City knew and should have known that such conduct created an extreme risk of harm to Plaintiff and other, yet acted with a reckless, conscious disregard for that risk. The

Exhibit 5 — REDLINE COMPARISON (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

City owed a duty of care to Plaintiff ~~and others~~ to ensure their safety and well-being in the management, cleanup, and communication of risks at the WTC disaster site area.

~~164~~169.        The City breached its ~~legal~~ duty and legal obligations ~~through inter alia failing~~ to comply ~~to~~ and or adhere to federal, state and local regulation, and acts and omissions aforesaid.

~~165~~170.        As a direct and proximate cause of the City's gross negligence, the Plaintiff suffered serious latent injuries caused by the latent effects of her exposure(s) including ~~but not limited to~~ Interstitial Lung Abnormalities, Interstitial Lung Disease, Lung disease, Myositis, Mixed or Undifferentiated Connective Tissue Disease, Anti-synthetase ASyS, new-onset Rheumatologic systemic Autoimmune disease, Bronchiectasis, that to a high degree of scientific probability and plausibility was caused as a result of her exposure(s) to and inhalation(s) of WTC toxic environmental contaminants, hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the 'high-exposure zone' where she lived. (*See* paras 100 to 111).

~~166~~171.        The above-mentioned occurrence(s) and the results thereof, were caused by the negligence, recklessness and carelessness of the City.

~~167~~172.        Said occurrence(s) and resulting injuries occurred without any fault or wrongdoing on the part of the plaintiff contributing thereto.

~~168~~173.        That by reason of the foregoing and the gross negligence and by the acts and omissions and admissions of the City, the Plaintiff was caused to suffer great bodily harm and serious latent injuries which threaten to shorten her life and afflict her remaining years. Plaintiff permanently suffers from the injuries and their effects, require ongoing medical care and treatment; and as a result of her injuries Plaintiff has been caused to amongst other suffer loss of quality and/or enjoyment of life, conscious pain and suffering, loss of income and diminished earning capacity, other economic damage, emotional distress and mental anguish, intentional and negligent inflictions of emotional distress, disfigurement, loss of society and companionship, loss of consortium, hedonic damages, and all other non-pecuniary losses of any kind of nature, punitive damages, future medical expenses and any and all damages sustained a resultant loss therefrom to which claimant is entitled to pursuant to case law and statute.

### AS AND FOR A THIRD CAUSE OF ACTION:
### FRAUDULENT MISREPRESENTATION

~~169~~174.        Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully stated herein.

~~170~~175.        That upon documentary evidence, prior to and on and after September 11, 2001, the City had knowledge of the presence of hazardous materials at the WTC site and the severe health risks associated with exposure(s) and inhalation(s).

~~171~~176.        The City had legal and moral obligations and responsibilities to disclose the hazardous substances at the WTC disaster site area and the associated health risks to Plaintiff ~~and the public health,~~ and to ensure safety and ~~public~~ health, but failed to.

~~172~~177.        The City knowingly misrepresented and concealed the risks of toxic exposures at the WTC disaster site area and engaged in actions such as suppressing and/or misrepresenting scientific findings, issuing false or misleading ~~public~~ statements including but not limited to claims that the air was " safe to breathe", and failing to implement or communicate adequate protective measures. (See ¶¶ 117-124, 141-147.)

Exhibit  5 — REDLINE COMPARISON  (Proposed TAC vs Filed TAC)
Additions shown in red; deletions shown by strikethrough

~~173~~178.          The Plaintiff reasonably relied on the City's false assertions and assurances including about the safe air-quality and safe conditions, and as a result of this reliance plaintiff continued to live and remain in affected areas without taking necessary protective measures.

~~174~~179.          As a direct and proximate cause of the City's fraudulent misrepresentations and concealments, Plaintiff suffered exposure(s) and inhalation(s) to WTC toxic environmental contaminants and hazardous substances and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, that to a high degree of scientific probability and plausibility caused the Plaintiff to develop serious latent injuries caused by the latent effects of said exposure(s) including but not limited to Interstitial Lung Abnormalities, Interstitial Lung Disease, Lung Disease, Myositis, Mixed or Undifferentiated Connective Tissue Disease, Anti-synthetase ASyS, new-onset Rheumatologic systemic Autoimmune Disease, Bronchiectasis, as a result of her exposure(s) to and inhalation(s) of WTC toxic environmental contaminants, and hazardous substances, and environmental toxicants, including, ~~but not limited to,~~ toxic dust and fumes, in the '~~high-~~exposure zone' where she lived. (*See* ~~paras 100 to 111.~~)

~~175~~180.          The above-mentioned occurrence(s) and the results thereof, were caused by the fraudulent concealment of the City.

~~176~~181.          Said occurrence(s) and resulting injuries occurred without any fault or wrongdoing on the part of the plaintiff contributing thereto.

~~177~~182.          That by reason of the foregoing and the fraudulent misrepresentation and concealment and by the acts and omissions and admissions of the City, Plaintiff was caused to suffer great bodily harm and serious latent injuries which threaten to shorten her life and afflict her remaining years. Plaintiff permanently suffers from the injuries and their effects, requires ongoing medical care and treatment; and as a result of her injuries Plaintiff has been caused to amongst other suffer loss of quality and/or enjoyment of life, conscious pain and suffering, loss of income and diminished earning capacity, other economic damage, emotional distress and mental anguish, intentional and negligent inflictions of emotional distress, disfigurement, loss of society and companionship, loss of consortium, hedonic damages, and all other non-pecuniary losses of any kind of nature, punitive damages, future medical expenses and any and all damages sustained a resultant loss therefrom to which claimant is entitled to pursuant to case law and statute.

WHEREFORE, Plaintiff JOSEPHINE JULES respectfully requests that this Court:

1.  Award general and compensatory damages in amount to be determined at trial;
2.  Award punitive damages due to the reckless and egregious conduct in an amount sufficient to deter similar misconduct;
3.  Award costs and attorney's fees incurred; and
4.  Grant such other relief as the Court deems just and equitable.