UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPHINE M. JULES,

                Plaintiff,

   against,

THE CITY OF NEW YORK,

                Defendant.

Case No. 24-cv-10056 (AKH)

---

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO THE CITY OF NEW YORK'S
FED. R. CIV. P. 12(b)(6) MOTION TO DISMISS

## Table of Contents

I.    PRELIMINARY STATEMENT ...............................................................................................1

II.   LEGAL STANDARD .........................................................................................................3

III.     ARGUMENT ................................................................................................................4

A. PLAINTIFF'S NOTICE OF CLAIM WAS TIMELY SERVED WITHIN NINETY DAYS OF THE FIRST MANIFESTATION OF HER WTC-CAUSED LATENT INJURIES ........................................................4

B.    THE THIRD AMENDED COMPLAINT PLAUSIBLY ALLEGES A SPECIAL DUTY OWED TO PLAINTIFF BY THE CITY ...............................................................................................11

C. THE THIRD AMENDED COMPLAINT SHOULD NOT BE DISMISSED WITH PREJUDICE — REPLEADING IS NOT FUTILE AND THE CITY'S ARGUMENT FAILS ON EVERY GROUND IT ASSERTS ...............................................................................................................21

IV. CONCLUSION .............................................................................................................32

**Cases**

*Abusio v. Consol. Edison Co. of N.Y.,* 238 A.D.2d 454, 454–55, 656 N.Y.S.2d 371 (2d Dep't 1997) .........9

*Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir. 2009) ...............................................................................4

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)............................................................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)...........................................................................3

*Brown v. City of New York*, 95 N.Y.2d 389, 393 (2000)........................................................................9

*Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021)................................................................20

*Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 452, 982 N.Y.S.2d 40, 5 N.E.3d 11 (2013)..............9

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) .......................................................5

*Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–24 (1993).....................28

*Cuffy v. City of New York*, 69 N.Y.2d 255 (1987) .................................................................................2

*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ................................................................... 21, 26

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).................21

*Downing v. New York City Housing Authority*, 117 N.Y.S.3d 464, at *5 (N.Y. Sup. Ct. Kings Cnty. 2019) ...........................................................................................................................................29

*Durr v. Slator*, 558 F. Supp. 3d 1, 15 (N.D.N.Y. 2021)..........................................................................4

*Elliott v. City of New York*, 95 N.Y.2d 730, 734–36 (2001) ..................................................................22

*Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 460 N.Y.S.2d 774 (1983) ...............................................29

*Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ...........................5

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ....................................................................................4

*Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999)................................................23

*In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 533–34 (S.D.N.Y. 2006).....................16

*In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 562 (S.D.N.Y. 2006) ...........................3

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 12-3403-cv(L) (2d Cir. 2014) .............9

*Klein v. Catholic Health System of Long Island, Inc.*, 220 N.Y.S.3d 757, 762 (N.Y. App. Div. 2d Dept 2024)...................................................................................................................................28

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)................................................................25

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) ....................................................29

*Lewis v. State*, 892 N.Y.S.2d 583 (N.Y. App. Div. 3d Dept 2009) ........................................................20

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015) 23

*Martin v. Herzog*, 228 N.Y. 164, 168–70 (1920) .................................................................................22

*Matter of Goffredo v. City of New York*, 830 N.Y.S.2d 11, 12 (N.Y. App. Div. 1st Dept 2006)............ 5, 24

*Matter of New York County DES Litig.*, 678 N.E.2d 474 (N.Y. 1997) .............................................. 5, 24

*O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 358 (1981).........................................................................9

*Palka v. Servicemaster Management Services Corp.*, 83 N.Y.2d 579, 587 (1994)........................... 16, 27

*Pelaez v. Seide*, 810 N.E.2d 393 (N.Y. 2004).......................................................................................20

*Piuggi v. Good For You Productions LLC,* 739 F. Supp. 3d 143, 154 (S.D.N.Y. 2024) ............................3

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ..................... 11, 25

*Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) ...........................................................................12

*Taunus Corp. v. City of New York*, 279 F. Supp. 2d 305 (S.D.N.Y. 2003)............................................20

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) ..........................................4

*Twombly*, 550 U.S. at 558, 570 ...........................................................................................................4

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ...............................................25

Plaintiff Josephine Jules ( the "Plaintiff") proceeding pro se, respectfully requests that the Court deny Defendant City of New York's ("the City") Rule 12(b)(6) Motion to Dismiss Plaintiff Third Amended Complaint.

## I.    PRELIMINARY STATEMENT

On and after September 11, 2001, Plaintiff — then pregnant — resided in Apartment 2904 at 100 John Street (abutting Gold Street) approximately 400 meters from Ground Zero, well within the EPA-recognized ≤0.5 km high-exposure band. Following mandatory evacuation and the City's authorization to reoccupy, Plaintiff called the City directly, expressing urgent concern for her safety and that of her unborn child. In response, the City — which held the lead role and primary authority over indoor environments from September 11, 2001 through February 2002 — made an appointment and dispatched the Federal Emergency Management Agency (FEMA) operating as the City's agent in support of the City's indoor environment responsibilities, not as an independent federal operation. The City's agent came to Plaintiff's apartment, conducted an in-person inspection, assured her there was no dust, declared the air safe to breathe, and provided her with a HEPA air machine. No air quality testing was performed. Plaintiff reasonably relied on those individualized assurances and remained in the exposure zone — suffering over 4,344 hours of toxic exposure — to her permanent and profound detriment. The City improperly conflates two clinically and etiologically distinct conditions to manufacture a false 2015 accrual date. Plaintiff's July 2015 diagnosis of Left-Ventricular Non-Compaction (LVNC) is a genetic heart muscle defect—gene-positive, confirmed by specialists at world-leading cardiac institutes in Canada and Sweden, with symptoms that resolved with medication cessation and ejection fraction normalization. LVNC is not a WTC-caused latent injury; it is a congenital structural anomaly. Plaintiff's physician notes confirm this directly: *"LV*

1

*noncompaction gene positive...very symptomatic, which is likely compounded by her medication intolerance"* (November 2021).

The manifestations of latent disease new-onset autoimmune that WTC exposure produced began October 2023 when Plaintiff was overcome with whole-body tremors, skin changes, and systemic illness. The notice of claim was served December 13, 2023, within 90 days. The City's conflation of a genetic LVNC with the notice of claim preserved latent NICM heart tissue injury is unsupportable. Plaintiff's notice of claim expressly preserved "multiple bodily injuries including **latent** injuries" and also included a sixteen-page peer-reviewed scientific article, *"Longitudinal Impact of WTC Dust Inhalation on Rat Cardiac Tissue Transcriptomic Profiles"*, placing the City on notice that Plaintiff's heart tissue injury claims encompassed latent nonischemic heart tissue injuries including Cardiac Sarcoidosis caused by WTC dust inhalation, not a genetic structural defect. Under New York law, a notice of claim need not enumerate every injury that may later manifest; it need only provide notice of the occurrence and the general nature of the claim.

The City mischaracterizes the TAC as alleging only generalized public duties. It does not. The TAC alleges that Plaintiff called the City; the City made an appointment; the City dispatched its municipal agent to her specific apartment; the agent conducted an individual in-person inspection; made specific safety representations to Plaintiff personally; and gave equipment directly to her — all under the City's lead role and primary authority over indoor environments. These facts satisfy every element of the voluntarily assumed special duty test under *Cuffy v. City of New York*, 69 N.Y.2d 255 (1987). The City's attempt to distance itself from the FEMA representative it dispatched—by characterizing FEMA as an independent federal actor—inverts the actual governmental structure during the time in question. The City held the lead role. The

2

City held delegated primary authority. FEMA supported it. Plaintiff called the City. The City answered. The duty is the City's. Further, the U.S. Senate Committee on Environment and Public Works, report's finding that EPA deference to NYC was "proper" has an important implication beyond the duty question: it means the City **cannot shift blame to EPA or FEMA** for the indoor air failures. If the Senate Committee found EPA's deference was proper because NYC had the assigned lead, then the responsibility for what happened in the indoor environment—including the false safety assurances delivered in Plaintiff's individual apartment inspections—rests with the City. The  prior dismissal was jurisdictional — no court has adjudicated the merits of the claims now before the Court. The TAC does not have a jurisdictional deficiency, pleads timely accrual under the latent injury discovery rule, and advances individualized special duty allegations (disclosed under oath during GML 50 -h hearing) on facts never previously tested on their merits.[1] [2]Dismissal with prejudice is unwarranted.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed only where it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); see also *Piuggi v. Good For You Productions LLC,* 739 F. Supp. 3d 143, 154 (S.D.N.Y. 2024). In applying this standard, the Court "give[s] no effect to

---

[1] Plaintiff clarifies that this toxic tort action asserts only New York state law claims;

[2] Although the Third Amended Complaint references both the Air Transportation Safety and System Stabilization Act ("ATSSSA") and, in the alternative diversity jurisdiction under 28 U.S.C. § 1332(a)(2), this toxic tort action asserts only New York state law claims, and jurisdiction lies in this Court pursuant to ATSSSA § 408(b)(3) "as a jurisdictional statute, not a preemption of state law causes of action"; the substantive law applicable to the claims remains New York state law. See *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 562 (S.D.N.Y. 2006).

assertions of law or to legal conclusions couched as factual allegations, but accept[s] as true the factual allegations of the complaint, and construe[s] all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir. 2009) (en banc). Pro Se Pleadings and the Plausibility Standard. As this Court has already recognized, pro se pleadings must be construed "liberally" and interpreted to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Even after *Twombly* and *Iqbal*, pro se complaints are not held to the same technical pleading standards as those drafted by counsel; they need only contain a "short and plain statement" that, taken as true and viewed with all reasonable inferences in the plaintiff's favor, plausibly entitles the plaintiff to relief. Fed. R. Civ. P. 8(a)(2). Dismissal at the pleadings stage is thus reserved for those cases where, "however true," the well-pleaded allegations "could not raise a claim of entitlement to relief," or where the plaintiff has "not nudged [her] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 558, 570; *Durr v. Slator*, 558 F. Supp. 3d 1, 15 (N.D.N.Y. 2021). In applying Rule 12(b)(6), the Court does not weigh evidence, resolve factual disputes, or choose among competing inferences. Instead, it simply asks whether, accepting Plaintiff's factual allegations as true and drawing all reasonable inferences in her favor, New York law could provide a remedy.

## III.    ARGUMENT

### A. PLAINTIFF'S NOTICE OF CLAIM WAS TIMELY SERVED WITHIN NINETY DAYS OF THE FIRST MANIFESTATION OF HER WTC-CAUSED LATENT INJURIES
#### i. The City's Accrual Argument Rests on a Condition That Is Not a WTC Injury and Is Not Claimed in This Action

The City's untimeliness argument falls on its face because it depends entirely on a medical condition — Left-Ventricular Non-Compaction Cardiomyopathy (LVNC) — that is not

4

alleged in the TAC to have been caused by WTC toxic exposure, is not claimed in the notice of claim, and as a matter of medical fact and law cannot constitute a manifestation or symptom of the latent disease that WTC exposures produced. Here, Plaintiff's LVNC is a **congenital genetic structural anomaly** — present from birth, gene-positive, and diagnosed in July 2015 by specialists at the Mazankowski Alberta Heart Institute in Edmonton, Canada, and subsequently managed at the Peter Munk Cardiac Centre and Karolinska University Hospital. (TAC ¶¶ 36–41.) The TAC expressly confines the LVNC diagnosis to the section headed "Plaintiff's Medical History (2015–2021)" — not to any cause of action, not to any alleged WTC injury, and not to the notice of claim's claimed injuries. (TAC ¶¶ 35–41.) The physician notes confirm the genetic etiology directly: *"LV noncompaction gene positive... very symptomatic, which is likely compounded by her medication intolerance"* (November 2021). (Attached as Exhibit to the Declaration of Josephine M. Jules Plaintiff , March 20, 2026, submitted herewith medical record documenting the genetic basis of Plaintiff's LVNC diagnosis.) This document is properly before the Court as integral to the TAC's medical history allegations. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). A congenital structural anomaly present from birth and gene-positive cannot, as a matter of law or fact, constitute a "manifestation or symptom of the latent disease that the harmful substance produced." *Matter of Goffredo v. City of New York*, 830 N.Y.S.2d 11, 12 (N.Y. App. Div. 1st Dept 2006) (citing *Matter of New York County DES Litig.*, 678 N.E.2d 474 (N.Y. 1997)). It was pre-existing. It was not caused by WTC exposure. It cannot trigger accrual of a claim it did not cause.

**ii. *Goffredo* Does Not Support the City's Position — It Confirms Plaintiff's**

The City's reliance on *Goffredo* is misplaced. The petitioner in *Goffredo* was a WTC worker whose Chronic Obstructive Pulmonary Disease was symptomatic within the months of his exposure and clinically confirmed within two years. *Matter of Goffredo*, 830 N.Y.S.2d at 12. His condition was the very disease his toxic exposure produced, and its symptoms manifested almost immediately.

Here, Plaintiff's case is the opposite. Her manifestations of new-onset rheumatologic systemic autoimmune disease the latent injury her WTC exposures produced and cardiac sarcoidosis, traction bronchiectasis, and the other related conditions pleaded—are diseases whose biological mechanism requires years to decades to manifest following toxic exposure. (TAC ¶ 137.) This Court has recognized that "exposure related injuries suffered at the World Trade Center and related sites following the September 11, 2001 attacks are largely latent injuries that do not assert themselves as such until months, years and decades after the pertinent exposures." (TAC ¶ 137.) Plaintiff experienced no manifestation or symptom of any WTC-caused latent injury prior to October 2023, when she was overcome with whole-body tremors, skin changes, and systemic illness — the first clinical presentation of new-onset rheumatologic systemic autoimmune disease. (TAC ¶¶ 97–101.) Serology confirmed diagnostic specificity in 2025. (TAC ¶ 107.) The notice of claim was served December 13, 2023 — within 90 days of October 2023. It is timely under *Goffredo*'s own rule.

### iii. Nonischemic Cardiomyopathy (NICM) Is a Broad Clinical Category — LVNC and Cardiac Sarcoidosis Are Distinct Diseases With Different Etiologies

The City's argument depends on collapsing two medically distinct conditions into a single injury by invoking their shared classification under the umbrella term "Nonischemic Cardiomyopathy" (NICM). That conflation is medically and legally unsupportable. NICM is not a diagnosis. It is a broad clinical category encompassing numerous conditions with different

etiologies, pathophysiologies, and clinical presentations. Here, Plaintiff's LVNC is a **congenital structural cardiomyopathy** — a developmental anomaly of left ventricular wall trabeculation, genetically determined, present before birth, and entirely independent of toxic exposure. The NICM heart tissue injury preserved in the notice of claim refers to **inflammatory cardiomyopathy caused by the autoimmune disease that WTC exposures produce** — specifically, cardiac sarcoidosis, an inflammatory granulomatous disease of cardiac tissue, detected by Late Gadolinium Enhancement on cardiac MRI in March 2024 and claimed in the TAC. (ECF No. 39, TAC ¶ 104.) The notice of claim included a sixteen-page peer-reviewed scientific article, *"Longitudinal Impact of WTC Dust Inhalation on Rat Cardiac Tissue Transcriptomic Profiles,"* expressly placing the City on notice that the claimed heart tissue injuries encompassed WTC dust-induced inflammatory cardiomyopathies — not genetic structural defects. (ECF No. 43-1, Def. Mem., Ex. A at 4–40.) The fact that two conditions share a broad clinical classification does not make them the same injury for accrual purposes. NICM as a category cannot be the unit of accrual analysis. *See Matter of New York County DES Litig.*, 678 N.E.2d at 477–78 (discovery rule focuses on the specific latent injury the exposure produced). A 2015 gene-positive congenital structural anomaly does not constitute the 2024 WTC-induced inflammatory autoimmune cardiac injury (ECF 39, TAC ¶ 104.) The City's argument requires the Court to treat cardiology's broadest clinical umbrella term as a single disease — a proposition no cardiologist and no court should accept.

### iv. Manifestation of Latent Disease WTC Exposures Produced

Manifestation of the latent disease new-onset autoimmune that the WTC exposures produced (whole body tremors) began in October 2023 with skin manifestations shortly thereafter; suspected serology January 2024, serology definitive March 2025, specificity definitive 2026

7

(ECF 39, TAC ¶ 97, 101.) A preponderance of evidence from high-quality epidemiologic studies demonstrates statistically significant associations between WTC exposure and new-onset rheumatologic systemic autoimmune disease in Responders and Survivors. The City Of New York Chief Medical Officer, David Prezant, M.D Special Advisor to the Commissioner on Health Policy, Director, World Trade Center Health Programs at FDNY admission of fact that evidence from epidemiologic studies demonstrates consistently strong statistically significant associations between WTC exposure and new-onset rheumatologic systemic autoimmune disease in Responders and Survivors like injuries like that suffered by the Plaintiff, and such is unequivocally supported by peer-reviewed scientific studies in non-WTC cohorts, including some from the National Toxicology Program, that clearly demonstrate a scientific biological plausibility. (The FDNY petition to add rheumatologic systemic autoimmune diseases to the WTC Health Program's list of covered conditions, as cited in the Third Amended Complaint at paragraph (ECF No. 39 ¶ 155-156), remains under review. This ongoing status does not affect its probative value for causation in this toxic tort claim under New York law).

The FDNY Chief Medical Officer's September 3, 2023, petition to add rheumatologic systemic autoimmune diseases to the WTC Health Program's covered conditions constitutes highly probative evidence of causation between World Trade Center toxic exposures and latent autoimmune conditions like the plaintiff's, as it unanimously recommends inclusion based on four high-quality epidemiologic studies demonstrating statistically significant associations (e.g., adjusted risk ratios of 1.86–3.40 for intense dust cloud exposure) in responders and survivors. This evidence, verbally referenced by the plaintiff during her GML § 50-h hearings in June and July 2024, raises plausible factual disputes on general and specific causation under New York's preponderance standard, precluding dismissal at the 12(b)(6) stage.

8

**v. The Notice of Claim's Own Language Defeats the City's Accrual Argument**

The notice of claim preserved "**multiple bodily injuries including latent injuries**" — the word *latent* appearing in the notice of claim itself. The City cannot simultaneously acknowledge receipt of a notice of claim that expressly characterizes the claimed injuries as latent and argue that those same injuries manifested and accrued in 2015. The latency designation in the notice of claim is itself evidence that the claimed injuries were not discoverable until shortly before the December 2023 filing. Under New York law, a notice of claim need only provide the municipality with notice of the occurrence and the general nature of the claim — it need not enumerate every injury that may later manifest. *Brown v. City of New York*, 95 N.Y.2d 389, 393 (2000); *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 358 (1981).

**vi. The City's WTC Health Program Enrollment Argument Does Not Establish Accrual**

The City argues that Plaintiff's enrollment in the WTC Health Program and her November 2022 clinical visit establish awareness of her WTC-caused injuries sufficient to trigger accrual. (MTD at 9.) This argument also fails. Enrollment in a medical monitoring program does not constitute discovery of a latent disease. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 12-3403-cv(L) (2d Cir. 2014) (affirming dismissal of independent medical monitoring claims, as they are not a cause of action under New York law (citing *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 452, 982 N.Y.S.2d 40, 5 N.E.3d 11 (2013)), and holding that damages for fear of cancer require a "'rational basis' for [the] fear[,] i.e.. a 'clinically demonstrable presence of toxins in the plaintiff's body [..].'" (quoting *Abusio v. Consol. Edison Co. of N.Y.,* 238 A.D.2d 454, 454–55, 656 N.Y.S.2d 371 (2d Dep't 1997) (brackets in original omitted); see also see *Jaime,* 43 N.Y.3d at 190, 237 N.E.3d at 802 (reasonable diligence standard under § 214-c does not impute knowledge absent objective

9

manifestations of the latent injury).) Plaintiff had one WTC doctor visit for general first meeting in 2022. Her subsequent WTC was in February 2023. False diagnoses were made on the phone after she questioned the missing PFT pages and data and Plaintiff objected and denied such immediately. (ECF No. 39, TAC ¶¶ 47.) "Obstructive Airway Disease specificity Asthma" and "Upper Respiratory Disease specificity Chronic Rhinosinusitis"—that the TAC expressly characterizes under the headings "Misdiagnoses and False Diagnoses" and "Obstruction of Care." (TAC ¶¶ 45–54, 69.) These false diagnoses were subsequently debunked—a specialist found "no evidence of asthma" and CT sinus imaging revealed no mucosal disease "no sinus issues". (TAC ¶¶ 69.)

### vii.. The City May Not Obtain Any Advantage From the Challenged 50-H Record

The City was contemporaneously informed of the genetic basis of Plaintiff's LVNC during the GML § 50-H examination, which is incorporated by reference into the TAC. (TAC ¶ 6.) Plaintiff has identified specific material omissions, and audio-visual irregularities including audio-mismatch distortions, freezing,  in the 50-H record. On November 22, 2024, Plaintiff notified the City by email that the recording was "not an unaltered copy" and contained "audio-visual inconsistencies," reserving all rights. On November 23, 2024, the City responded that it made no edits and was "not aware of any edits *(other than whatever edits the court reporting service did)*" — a written admission that edits were made. Critically, during the deposition, when Plaintiff requested a copy on the record and the Court Reporter asked, "You're ordering a copy?", the City interjected: *"We'll be providing her a copy [...] we'll take care of the video and the transcript"* — thereby voluntarily assuming custody and control over the challenged materials. That undertaking makes it inappropriate for the City to seek any procedural advantage from the produced record while disavowing responsibility for defects in its production. The Court should

10

draw an adverse inference that the missing testimony established LVNC's genetic nature, consistent with *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002), and should not credit the challenged record to Plaintiff's detriment while the integrity dispute remains unresolved. Plaintiff preserves all objections and remedies under Fed. R. Civ. P. 30, 32, and 37(e) and the Court's inherent authority.

### viii. The City's Theory Is Internally Inconsistent and Asks the Court to Resolve Factual Disputes Impermissible at the Pleading Stage

The City's argument is self-defeating. It relies on LVNC to manufacture an earlier accrual date while that same condition — by the City's own characterization a pre-existing genetic anomaly—cannot have been caused by the WTC exposures at the heart of this lawsuit. A condition that is simultaneously pre-existing and genetically determined cannot be both unrelated to WTC exposure and the accrual trigger for a WTC exposure claim. The City cannot have it both ways. *Cf. Heiman v. City of New York*, 447 N.Y.S.2d 158, 160 (N.Y. App. Div. 1st Dept 1982) (rejecting speculative accrual dates based on misattributed symptoms). Moreover, the questions of when Plaintiff's WTC-caused injuries manifested and whether those injuries are distinct from her congenital LVNC are inherently fact-intensive, requiring medical evidence and expert testimony. On a Rule 12(b)(6) motion the Court must accept the well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The TAC pleads, accepted as true, that no WTC-caused latent injury manifested before October 2023. That allegation is sufficient. The City's motion must be denied.

### B.      THE THIRD AMENDED COMPLAINT PLAUSIBLY ALLEGES A SPECIAL DUTY OWED TO PLAINTIFF BY THE CITY
### i. Plaintiff Called the City; the City Dispatched the Representative

The City's motion rests on a fundamental mischaracterization of what the TAC actually alleges. The City frames the FEMA representative's visit as an independent federal action disconnected from any City duty. The TAC alleges the opposite. On a motion to dismiss, the Court must accept these allegations as true and draw all reasonable inferences in Plaintiff's favor—not Defendant's. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The City's attempt to substitute its characterization of the TAC for the TAC's actual allegations is impermissible. *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

Following mandatory evacuation and the City's reoccupancy authorization, Plaintiff — pregnant, residing 500 meters from Ground Zero — called the City and requested an inspection of her apartment due to her near-field proximity, her pregnancy, and her air safety concerns. (ECF No. 39, TAC ¶ 142.) In response, the City dispatched a representative through its coordinated disaster response framework. (ECF No. 39, TAC ¶ 142.) That representative identified himself (acting in coordination with the City's post-9/11 environmental health and safety response), conducted an in-person inspection of Plaintiff's specific apartment, declared the air safe without performing any air quality testing, and delivered a HEPA air machine to Plaintiff directly. (ECF No. 39, TAC ¶¶ 142–145.) The TAC does not allege that Plaintiff contacted FEMA directly. It does not allege an independent federal action. It alleges that the City answered Plaintiff's call and sent a representative to her home under the City's own lead authority over indoor environments. The TAC's allegations that Plaintiff called the City's response infrastructure and the City dispatched a representative to her apartment (ECF No. 39, TAC ¶¶ 142–143) are corroborated by the sworn congressional testimony of the City's own witness. Dr. Miele of the NYC DEP testified before the Senate Committee that the City "established HELP lines for concerned owners or tenants to respond to complaints," that tenants "did call us on occasion," and that in response, "We would

come out, we would question the results, take a look at the results of the cleanup that had been done, and the air testing that had been done, and if we had any questions, we did our own air testing." (Senate Hearing, S. Hrg. 107-524 at 45). This is the City's own official, testifying under oath to Congress, describing the precise dispatch-and-inspect protocol the TAC alleges Plaintiff triggered. The City cannot credibly argue at the pleading stage that Plaintiff's allegations of calling and receiving a City-dispatched inspection are implausible when its own sworn witness described that exact protocol to Congress.

**ii. The City Held Delegated Primary Authority Over Indoor Environments : The Congressional Record Establishes What the City Now Disputes**

The City argues that FEMA operated independently of the City and that its actions cannot be attributed to the City. This is refuted by the federal government's own admissions. The United States Environmental Protection Agency stated on the record before the Senate Committee on Environment and Public Works that it "has lead [sic] the effort to monitor the outdoor environment while the city of New York has taken the lead regarding the preoccupancy of buildings." ( Senate Hearing, 2002,S. Hrg. 107-524 at 73-74.) This is not Plaintiff's characterization — it is the EPA's own words, on the congressional record, confirming the precise authority allocation Plaintiff has alleged: the City led indoors; the EPA led outdoors. Any FEMA personnel operating in the indoor environment during this period were therefore operating within the City's lead authority and in support of it, not as independent federal actors. Plaintiff respectfully requests this Court take judicial notice of this Senate hearing record pursuant to Fed. R. Evid. 201(b)(2). *See* MTD at 14 n.6 (City itself requesting judicial notice of government website).

13

The City's own governmental partners confirmed before Congress, under oath, the precise authority structure Plaintiff alleges. The EPA stated on the Senate record that "the city of New York has taken the lead regarding the preoccupancy of buildings." S. Hrg. 107-524 at 73-74. FEMA's own senior official, Marianne C. Jackson, testified that federal workers — including approximately 1,300 FEMA personnel — were "deployed to New York City to *support* the disaster response," and that FEMA "began working closely with . . . the New York City Department of Environmental Protection . . . to monitor and address air quality concerns." ( Senate Hearing, 2002, S. Hrg. 107-524 at 34). This is the governmental structure Plaintiff describes in ECF No. 39, TAC ¶¶ 142–143: FEMA personnel operating within and in support of the City's primary authority indoor environment response, coordinating directly with NYC DEP — the City's own department. The City's litigation position — that FEMA was a separate, independent federal actor whose conduct cannot be attributed to the City — is directly contradicted by FEMA's own congressional testimony.

The governmental authority structure operative during Fall 2001 is not a matter of inference or allegation — it is established by the sworn congressional record and the formal findings of the United States Senate Committee on Environment and Public Works. The EPA stated before Congress that "the city of New York has taken the lead regarding the preoccupancy of buildings." (S. Hrg. 107-524 at 73-74). FEMA's senior official testified that federal workers were "deployed to New York City to support the disaster response" and that FEMA worked "closely with . . . the New York City Department of Environmental Protection . . . to monitor and address air quality concerns." (S. Hrg. 107-524 at 34, 111.) The City's own NYC DEP witness testified that the City established helplines for tenants, that tenants called, and that the City dispatched inspectors to apartments to review cleanup results and conduct its own air testing. (S.

14

Hrg. 107-524 at 45). The Senate Committee's formal oversight investigation then confirmed the legal conclusion that flows from all of this: "On matters of indoor air in the Fall of 2001, it was proper for EPA to defer to New York City, which was assigned the lead role." (Senate Oversight Report at 2 (emphasis added).)[3]

This is not Plaintiff's characterization. This is the United States Senate's formal investigative finding. The City held the assigned lead for indoor air. FEMA supported that lead. The representative dispatched to Plaintiff's apartment operated within the City's assigned domain of primary authority. On this record the City cannot credibly argue that FEMA's involvement was an independent federal operation disconnected from City authority — Congress found otherwise. The duty that the City's dispatch generated runs to the City — and as demonstrated below, that duty was non-delegable once assumed, and it was specifically and individually assumed as to Plaintiff when the City answered her call, made an appointment, and sent its agent to her home.

### iii. The City's Duty Was Non-Delegable

From September 11, 2001 through February 2002, the City held the lead role and primary delegated authority over indoor environments and indoor air quality under the Federal Response Plan's Emergency Support Function framework. The EPA delegated indoor environment authority to the City. FEMA operated in a supporting role beneath the City's authority—not as an

---

[3] Plaintiff respectfully requests judicial notice, pursuant to Fed. R. Evid. 201(b)(2), of the following government documents: (1) *Air Quality in New York City After the September 11, 2001 Attacks: Hearing Before the S. Comm. on Environment & Public Works*, 107th Cong. (2002), S. Hrg. 107-524, at pages 34, 45, 73-74,111; and (2) *Report on the Oversight Investigation of the EPA's Response to the World Trade Center Collapse*, S. Comm. on Env't & Pub. Works (Sept. 23, 2003). Both are published United States Senate Committee documents whose accuracy cannot reasonably be questioned. *See Oneida Indian Nation*, 337 F.3d at 168 n.14. The City has itself invoked judicial notice of government materials in this proceeding. (MTD at 14 n.6.)

independent actor. *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 533–34 (S.D.N.Y. 2006).

When the City accepted that delegated authority, it assumed the corresponding duty of care — and that duty was **non-delegable**. Under *Palka v. Servicemaster Management Services Corp.*, 83 N.Y.2d 579, 587 (1994), once a party undertakes a duty affecting safety, that duty cannot be avoided by assigning its performance to another. By accepting primary authority over indoor air quality and indoor environments, the City assumed the corresponding duty to Plaintiff when she called requesting inspection — and cannot escape that duty by noting that FEMA personnel physically conducted the inspection. FEMA was the means by which the City discharged its duty, not a substitute for it. The duty remained the City's. Municipal police powers over health and safety — vested in the City under N.Y. Const. Art. IX and N.Y.C. Charter §§ 556 and 563 — are non-delegable as a matter of New York law and do not transfer to a federal supporting agency operating at the City's direction.

**iv. *Cuffy v. City of New York* Is the Governing Framework — and All Four Elements Are Satisfied**

*Cuffy v. City of New York*, 69 N.Y.2d 255, 260, 505 N.E.2d 937 (1987), establishes the test for a voluntarily assumed special duty: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) direct contact between the municipality's agents and the injured party; and (4) the party's justifiable reliance on the municipality's affirmative undertaking.

(1) In *Cuffy*, a police lieutenant's oral promise to take action "first thing in the morning" satisfied the first element — even though the promise was never kept. Here, the City did far

16

more. With lead role and delegated primary authority over indoor environments the City received Plaintiff's specific call, made an appointment, and dispatched a municipal agent representative to her apartment at 100 John Street, Apartment 2904. (ECF No. 39, TAC ¶ 142.) That representative conducted a physical inspection, verbally declared the apartment safe, and handed Plaintiff a HEPA air machine. (ECF No. 39, TAC ¶¶ 143–144.) A physical dispatch, in-person inspection, specific oral safety declarations, and delivery of protective equipment constitute an affirmative assumption of duty through both promises and actions — a materially stronger posture than the telephone promise at issue in *Cuffy*. The affirmative duty assumed when the City dispatched a representative to Plaintiff's apartment in response to her call (TAC ¶ 142) was an exercise of the City's own lead authority over indoor environments, implemented through FEMA personnel who were operating in direct coordination with NYC DEP. FEMA's Marianne C. Jackson testified that FEMA worked "closely with . . . the New York City Department of Environmental Protection . . . to monitor and address air quality concerns." (S. Hrg. 107-524 at 111.) The representative who came to Plaintiff's door was not a federal actor operating outside the City's authority — he was part of the City-coordinated, NYC DEP-integrated framework the City organized, led, and benefited from.

(2)The City's knowledge of the hazards is extensively documented in the TAC. The NYC DOH received an EPA letter on October 5, 2001 declaring the WTC site posed threats from building materials, stored hazardous materials, and combustion products from still-burning fires. (ECF No. 39, TAC ¶¶ 123, 166.) The City knew of approximately 400 tons of asbestos in WTC fireproofing prior to September 11 (ECF No. 39, TAC ¶ 125); at least 40,000 pounds of released lead (TAC ¶ 126); and dioxin levels near the site showing "unambiguous elevation." (ECF No. 39, TAC ¶ 130.) The City's own Chief Medical Officer has since acknowledged "consistently

17

strong statistically significant associations between WTC exposure and new-onset rheumatologic systemic autoimmune disease." (ECF No. 39, TAC ¶ 155.) Dispatching a representative to declare Plaintiff's apartment safe without air quality testing (ECF No. 39, TAC ¶ 145), while possessing this knowledge, is precisely the governmental misrepresentation the second element addresses;

(3) In *Cuffy*, the direct contact element was satisfied by a personal visit to a police precinct. Here the contact was reciprocal and more direct: Plaintiff called the City; the City dispatched a representative to her home; the representative was physically present in her apartment; he spoke to her directly; he handed her equipment. (ECF No. 39, TAC ¶¶ 142–144.) *Cuffy* instructs that "the proper application of the 'direct contact' requirement depends on the peculiar circumstances of each case." 69 N.Y.2d at 260. A government agent physically present in Plaintiff's apartment, face-to-face, is stronger than *Cuffy*, not weaker. The third element is satisfied. Plaintiff's justifiable reliance is further established by the City's own protocol as testified to by its DEP witness. The City's post-9/11 indoor response protocol included dispatching personnel to inspect units and conducting independent air testing "if we had any questions." Senate Hearing at [page]. A pregnant resident 500 meters from Ground Zero, who had specifically called to request an inspection (TAC ¶ 142), presented every conceivable reason for the City's representative to have questions — and to conduct testing. He did not (TAC ¶ 145). Plaintiff's reliance on his declaration of safety was justified both because she had no means of perceiving latent toxic contamination independently, and because she was entitled to assume the City's representative was following the City's own documented protocol. That he was not is the City's breach — not a reason to deny Plaintiff the benefit of her justifiable reliance.

18

(4) Justifiable reliance is the element powerfully distinguishes Plaintiff's case in her favor. In *Cuffy*, reliance failed because the plaintiffs knew by midday that the promised police action was not forthcoming — they could look out the window and see no police presence — yet remained anyway. Reliance ceased to be justifiable when its falsity became objectively apparent. Plaintiff's situation is categorically different. She was not waiting for promised future action that never visibly appeared. She was told by the City's own representative, after an in-person inspection, that the threat did not exist—that the air was safe. WTC toxic contamination is invisible. Asbestos fibers, dioxins, PCBs, and heavy metal particles cannot be perceived by the naked eye. The latent autoimmune disease, interstitial lung disease, and cardiac injuries Plaintiff ultimately developed did not manifest for decades. There was no "unfolding event" that could have alerted Plaintiff that the City's declaration of safety was false. Unlike the *Cuffy* plaintiffs who had an observable signal that the promise was being broken, Plaintiff had no such signal— the City's representative had resolved that uncertainty with a specific, affirmative, false declaration of safety. Plaintiff's continued residence in the exposure zone for roughly 181 days 4,344 hours (TAC ¶ 153) flowed directly and causally from that false assurance. *Cuffy*, 69 N.Y.2d at 258. The fourth element is satisfied—and satisfied more strongly than the facts before the *Cuffy* Court itself.

**v. The City's "Generalized Duty" Characterization Is Factually Unsupportable**

The City argues that the TAC alleges only generalized public duties. (Def. Mem. at 12–15.) *Cuffy* forecloses this on these facts. The conduct at issue is not a public advisory, a press conference, or a zone-level governmental decision. It is: Plaintiff calling the City; the City making an appointment; the City dispatching a representative to Plaintiff's specific apartment; the representative conducting an individual inspection; making specific safety declarations to

19

Plaintiff; and handing her physical equipment. (ECF No. 39, TAC ¶¶ 142–145.) That is not a general duty. That is the precise individual governmental assumption of duty that *Cuffy* recognizes as creating a special relationship.

**vi. *Taunus* Does Not Govern and the Advisory Cases Are Inapplicable**

The City relies on *Taunus Corp. v. City of New York*, 279 F. Supp. 2d 305 (S.D.N.Y. 2003), for the proposition that City control over the Frozen Zone created no special duty. (Def. Mem. at 14.) *Taunus* addressed property damage claims arising from the City's *territorial* control over an area—the closure of Lower Manhattan, restrictions on access. There was no allegation in *Taunus* of a specific citizen calling the City for help, the City dispatching a representative to that citizen's home in response, and the City's representative making individual safety declarations to that citizen. These are categorically different facts. The City further relies on *Lewis v. State*, 892 N.Y.S.2d 583 (N.Y. App. Div. 3d Dept 2009), and *Pelaez v. Seide*, 810 N.E.2d 393 (N.Y. 2004), for the proposition that health advisories do not constitute assumption of positive direction and control. (Def. Mem. at 16.) These cases address broadcast public communications — mailings, press releases, public announcements to populations. They have no application where a government agent appeared in Plaintiff's apartment, conducted a physical inspection, and made specific oral safety representations directly to her. That is operational, individual, targeted governmental conduct—not an advisory.

**vii. *Cuffy* Leaves No Basis for Dismissal on the Pleadings**

Whether a plaintiff has alleged sufficient facts to establish a special relationship under *Cuffy* is a question of law — but on a motion to dismiss it is resolved on the pleadings, accepted as true. *Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021). Accepted as true, the TAC satisfies every *Cuffy* element: the City assumed an affirmative duty by dispatching a

20

representative to Plaintiff's specific apartment in response to her specific call (Element 1); the City had actual documented knowledge that the air was dangerous (Element 2); the City's representative was physically present in Plaintiff's home (Element 3); and Plaintiff, having no means of perceiving the safety declaration was false, relied on it for months sustaining 4,344 hours of toxic exposure (Element 4). The motion to dismiss on special duty grounds must be denied.

## C. THE THIRD AMENDED COMPLAINT SHOULD NOT BE DISMISSED WITH PREJUDICE — REPLEADING IS NOT FUTILE AND THE CITY'S ARGUMENT FAILS ON EVERY GROUND IT ASSERTS

### i. Futility Requires Substantive Incurability, Not Mere Disagreement

The City bears a demanding burden in seeking dismissal with prejudice. Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). Dismissal with prejudice is reserved for cases where "the problem with [the plaintiff's] causes of action is substantive" and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). An amendment is futile only if it "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). That standard requires the Court to assess whether the complaint, construed liberally with all reasonable inferences drawn in Plaintiff's favor, states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a pro se plaintiff, the Court construes the pleadings liberally to raise the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). The City has not met this standard on any of the grounds it advances.

### ii. The Governing Substantive Law Is New York State Law — Judge Hellerstein Has So Ruled

At the outset, the framework within which futility must be assessed is critical. Plaintiff's three causes of action — negligence, gross negligence, and fraudulent misrepresentation — are

21

New York state law claims. (ECF No. 39, TAC ¶¶ 159, 173, 182.) Under ATSSSA § 408(b)(2), the substantive law governing this action is the law of New York State unless inconsistent with federal law. Judge Hellerstein has ruled that WTC latent injury claims are governed by New York state law. *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 541–42 (S.D.N.Y. 2006). (TAC ¶ 111.) That ruling is the settled law of this Court and this master docket.[4]

This governs the futility analysis in a fundamental way. The City's assertion that Plaintiff "fails to and cannot allege facts sufficient to establish a duty" must be evaluated against what New York state law actually requires for each cause of action — not a federal standard, not a heightened pleading requirement New York does not impose, and not what the City wishes the law required. Whether the TAC's allegations satisfy New York negligence, gross negligence, and fraudulent misrepresentation is a New York state law question. The City's motion does not engage with the distinct elements of each cause of action under New York law. That failure is independently fatal to its futility argument.

### iii. The Prior Dismissal Was Jurisdictional — No Court Has Adjudicated These State Law Claims on the Merits

The City argues Plaintiff has amended three times and further amendment is futile. (Def. MTD. at 19-20.) This framing is misleading in a critical respect that must be examined with

---

[4] New York Negligence law permits courts and juries to look to statutory and regulatory standards, including federal environmental standards, as evidence of the applicable standard of care (duty) and breach in state-law toxic tort cases. They may define or inform the standard of care even where they do not themselves provide a private right of action. Statutes, regulations, and ordinances are at least admissible as evidence of negligence. See *Martin v. Herzog*, 228 N.Y. 164, 168–70 (1920); *Elliott v. City of New York*, 95 N.Y.2d 730, 734–36 (2001). Consistent with those principles, the Third Amended Complaint's references to federal environmental statutes and regulations (e.g., the Clean Air Act, CERCLA, RCRA) are **not pleaded as causes of action**, but only as standards informing care (duty) and breach under New York law: they inform the standards of care (duty) and breach under New York law. *See Martin v. Herzog* (statutory standards can define duty) and *Elliott v. City of New York* (ordinances/regulations are evidence of negligence). See *Martin v. Herzog*, 228 N.Y. 164, 168–70 (1920); *Elliott v. City of New York*, 95 N.Y.2d 730, 734–36 (2001).

22

precision. The Third Amended Complaint filed January 6, 2026 is the **first complaint to be adjudicated on its merits** under New York state law. The prior dismissal with leave to replead (ECF No. 8) was on jurisdictional grounds — not a merits adjudication of any state law cause of action. A dismissal for lack of subject matter jurisdiction carries no preclusive merits effect and must be without prejudice. *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999). The City's motion to dismiss the SAC was **withdrawn** before any adjudication—the City itself stated it would respond to the TAC "in the interest of judicial efficiency." It was never ruled upon. No court applying New York state law has ever evaluated whether the TAC's specific allegations — Plaintiff called the City; the City made an appointment and dispatched its agent under its primary lead authority over indoor environments; the agent conducted an individual inspection and made false safety declarations without testing—establish a *Cuffy* special duty, a *Palka* non-delegable duty, or the elements of gross negligence or fraudulent misrepresentation under New York law. *Cuoco*'s futility standard presupposes that a substantive defect has been identified and found incurable. Where no court has yet ruled on the merits, that standard has not been triggered.

Further, the TAC presents new facts of material to the claim concerning direct contact with the City disclosed during her GML § 50-h hearing not in any prior complaint. As the City itself acknowledges, the TAC "includes rephrased allegations and raises new factual assertions with respect to Plaintiff's alleged interactions with FEMA." (Def. Mem. at 3 n.2.) Under *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015), dismissal with prejudice is inappropriate where new allegations have not had a fair opportunity for merits adjudication. Plaintiff has not had that opportunity here. Permanently closing the

23

courthouse on new factual allegations before a single merits ruling under New York state law is directly contrary to *Loreley* and to the liberal amendment policy of Rule 15(a)(2).

**iv. The Notice of Claim Futility Argument Fails — The TAC Already Pleads Timely Accrual**

The City's first futility ground is that Plaintiff's notice of claim accrued in July 2015 and is untimely. (Def. Mem. at 19–20.) As demonstrated *supra*, this argument fails as a matter of New York law. It rests on Plaintiff's congenital genetic Left-Ventricular Non-Compaction Cardiomyopathy—a gene-positive structural anomaly present from birth, confirmed by specialists at world-leading cardiac institutes, and included in the TAC solely as background medical history. LVNC is not a WTC-caused injury. It is not claimed in the notice of claim. It cannot as a matter of New York law constitute a "manifestation or symptom of the latent disease that the harmful substance produced." *Matter of Goffredo v. City of New York*, 830 N.Y.S.2d 11, 12 (N.Y. App. Div. 1st Dept 2006).

For futility purposes the dispositive point is this: **the TAC already pleads the correct accrual date with specificity**. Plaintiff experienced no manifestation of any WTC-caused latent injury prior to October 2023. (ECF No. 39, TAC ¶ 97.) The notice of claim was served December 13, 2023—within 90 days. (ECF No. 39, TAC ¶ 5.) The notice of claim expressly preserved "multiple bodily injuries including **latent** injuries." These allegations, accepted as true, establish timely accrual under New York's toxic-tort discovery rule. *Matter of New York County DES Litig.*, 678 N.E.2d 474 (N.Y. 1997); CPLR 214-c. The accrual question is not incurable—the TAC already cures it. Where a complaint already pleads the facts necessary to establish timeliness, the claim is not futile. If the Court finds any further specificity is required—that is straightforwardly curative—the opposite of futility.

**v. The City's Accrual Futility Argument Cannot Be Sustained on a Spoliated Record**

Separately and independently, the City cannot obtain dismissal with prejudice on an accrual argument that depends on an admitted-edited evidentiary record it controlled. The City assumed on-the-record custody and control of the GML § 50-H deposition recording when its representative interjected answered a question directed to Plaintiff and after she asked of a copy of the record, the interjected and stated: *"We'll be providing her a copy [...] we'll take care of the video and the transcript."* This occurred on two separate GML § 50-h hearing days. The recording produced contains Plaintiff has identified specific material omissions, and audio-visual irregularities including audio-mismatch distortions, freezing,  in the 50-H record. On November 23, 2024, the City admitted in writing it was "not aware of any edits *(other than whatever edits the court reporting service did)*" — a written acknowledgment that edits were made. The Court has previously been notified of the spoliation. Under *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002), spoliation is established: the City controlled the evidence, knew edits were made, and is pressing a litigation argument that depends on the absence of the missing testimony. The Court should draw an adverse inference that the missing testimony established LVNC's genetic nature — which defeats the City's accrual argument on its own terms. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). A futility ruling premised on an accrual argument that an adverse inference defeats is legal error. At minimum, the Court should not rule on futility on the notice of claim ground while the integrity of the primary evidentiary record on that issue remains unresolved. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

**vi. The Special Duty Futility Argument Fails — Three Independent Grounds Under New York State Law**

The City's second futility ground is that Plaintiff "fails to and cannot allege facts sufficient to establish a duty owed to her by the City." (MTD at 20.) This argument fails under New York state law on three independent grounds—none of which the City's motion addresses. The City also argues that no special duty can exist as a matter of law (Def. Mem. at 20) but that argument assumes the absence of any formal governmental assignment of indoor air authority to the City. The Senate's formal investigative finding that NYC was "assigned the lead role" for indoor air is newly discovered available, sworn, official government evidence that directly contradicts the legal premise of the City's futility argument. Where newly available governmental documentary evidence changes the legal landscape, dismissal with prejudice is improper. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (futility exists only where substantive defects cannot be cured—not where documentary evidence supports the claim's viability).

### *Cuffy* Voluntarily Assumed Special Duty.

Under *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987), a voluntarily assumed special duty arises where: (1) the municipality assumed an affirmative duty through promises or actions; (2) its agents had knowledge that inaction could lead to harm; (3) there was direct contact between the municipality's agents and the injured party; and (4) the party justifiably relied on the municipality's affirmative undertaking. The TAC satisfies all four elements: Plaintiff called the City and the City made an appointment and dispatched its agent to her specific apartment (Element 1); the City possessed actual documented knowledge of lethal contamination including the EPA's October 5, 2001 letter (Element 2); the City's agent was physically present in Plaintiff's apartment face-to-face (Element 3); and Plaintiff relied on the false safety declaration for 181 days of toxic exposure with no means of perceiving its falsity (Element 4). (ECF No. 39, TAC ¶¶ 123, 142–145, 153, 166.) These are specific individual facts — not conclusory assertions

26

— that satisfy *Cuffy*'s test under New York law. The City has not demonstrated that this theory is legally impossible. It has demonstrated that it disagrees with it. Disagreement is not futility.

***Palka* Non-Delegable Duty.**

Under *Palka v. Servicemaster Management Services Corp.*, 83 N.Y.2d 579, 587 (1994), once a party undertakes a duty affecting safety, that duty is non-delegable and cannot be avoided by assigning performance to another entity. The City accepted primary delegated EPA authority over indoor environments from September 11, 2001 through February 2002. That acceptance created a duty to Plaintiff when she called requesting inspection. The City cannot escape that duty by noting that FEMA personnel physically conducted the inspection — FEMA was the means by which the City discharged its duty, not a substitute for it. Municipal health and safety powers under N.Y. Const. Art. IX and N.Y.C. Charter §§ 556 and 563 are non-delegable as a matter of New York law. The City's motion does not address *Palka* at all. A New York state law theory the City has never briefed cannot be declared legally futile.

**Statutory Duty Under New York City Charter §§ 556(c)(2) and 563.**

The TAC alleges breach of the City's non-delegable statutory duty under N.Y.C. Charter § 556(c)(2) to supervise the reporting and control of hazardous conditions and to abate public health nuisances, and under Charter § 563, which obligated the City's Board of Health, once in possession of proof of "great and imminent peril," to adopt and enforce protective orders. (ECF No. 39, TAC ¶ 136.) The City received documentary proof of such peril—the EPA's October 5, 2001 letter to NYC DOH (ECF No. 39, TAC ¶¶ 123, 166)—and issued false reassurances instead. Plaintiff, pregnant resident within the ≤0.5 km high-exposure band who specifically requested inspections constitute a cognizable class for whom these Charter provisions were

27

enacted. This statutory duty theory has not been addressed in the City's futility argument. It independently forecloses a finding of futility.

**vii. The City's Futility Argument Fails Because It Does Not Engage With All Three Causes of Action Under New York Law**

The City's Section C treats three distinct New York state law causes of action as a single block. (Def. Mem. at 19–20.) Under *Cuoco*, futility requires showing that the problem with each cause of action is substantive. The City must establish futility as to negligence, gross negligence, and fraudulent misrepresentation independently — under their respective New York law elements. It has not done so as to any of them.

**Negligence — N.Y. Elements: Duty, Breach, Proximate Causation.**

Under New York law, negligence requires: (1) a duty owed to the plaintiff; (2) breach; and (3) injury proximately caused thereby. *Klein v. Catholic Health System of Long Island, Inc.*, 220 N.Y.S.3d 757, 762 (N.Y. App. Div. 2d Dept 2024). The TAC plausibly alleges all three: special duty through *Cuffy* and *Palka* (Point II); breach by declaring the air safe without testing while possessing actual knowledge of lethal contamination (ECF No. 39, TAC ¶¶ 123–134, 145); and proximate causation through 4,344 hours of toxic exposure resulting in latent disease injury including new-onset systemic autoimmune disease cardiac sarcoidosis injury (TAC ¶¶ 97-111,145, 151, 153). The negligence claim is not futile.

**Gross Negligence — N.Y. Elements: Negligence Plus Reckless Disregard.**

Gross negligence under New York law requires the elements of negligence plus conduct that "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–24 (1993). The City's futility argument does not address this distinct standard at all. That omission is dispositive. The TAC pleads gross negligence with specific factual allegations that go materially beyond

28

ordinary negligence. The City possessed the EPA's October 5, 2001 letter confirming active lethal hazards yet dispatched a representative to declare Plaintiff's apartment safe without testing. (TAC ¶¶ 123, 144–145, 166.) The City assumed "positive direction and control" over the WTC site—a known toxic hazard—yet failed to mitigate risks (ECF No. 9, ¶¶ 135-136, 149), akin to *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 460 N.Y.S.2d 774 (1983) (duty where entity controls a known blatant danger). While recent expansions like *Weisbrod-Moore v. Cayuga County*, 2025 NY Slip Op 00903 (N.Y. Feb. 18, 2025) (exception for custodial duties), do not directly apply, they underscore the doctrine's flexibility for foreseeable harms in government-managed scenarios. The TAC alleges the City assumed control in Lower Manhattan by supervising environmental assessments, directing cleanup, managing air safety communications. The City's post 9/11 operational role consists of aspects resembling private-site management support liability under ordinary negligence, as in *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 562–63 (S.D.N.Y. 2006) (treating City's site supervision for workers as proprietary). While that case focused on on-site responders, the logic arguably extends when the City's undertakings created a special duty through voluntary assumption or control over known dangers. *See Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 194 N.E.3d 239, 247 (2022) (operational misfeasance may bypass special duty in limited contexts).

### viii. Fraudulent Misrepresentation — N.Y. Elements: False Statement, Scienter, Intent to Induce, Justifiable Reliance, Damages, Special Relationship.

Fraudulent misrepresentation under New York law requires: (1) a material misrepresentation of a known false fact; (2) scienter; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). For fraud against a municipality, a special relationship is additionally required. *Downing v. New York City Housing Authority*, 117 N.Y.S.3d 464, at *5 (N.Y. Sup. Ct. Kings Cnty. 2019). The

29

City's futility argument does not address fraudulent misrepresentation's distinct elements at all. That omission is again dispositive.

The TAC plausibly alleges each element under New York law: (1)*Material misrepresentation of a known false fact* — The City's agent declared Plaintiff's apartment air safe without testing (TAC ¶ 144) while the City possessed the EPA's October 5, 2001 letter confirming active hazardous threats and pre-9/11 knowledge of 400 tons of asbestos in WTC fireproofing. (TAC ¶¶ 123–125, 166.); (2)*Scienter* — The City knew the air was not safe. It possessed contemporaneous documentary proof. Declaring safety without testing in the face of that knowledge establishes scienter—at minimum reckless disregard for the truth. *Lama Holding*, 88 N.Y.2d at 421; (3) *Intent to induce reliance* — The City's false assurances were specifically directed at inducing Plaintiff to return to and remain in the exposure zone. (TAC ¶¶ 117–118, 141.) The individualized apartment visit — appointment, dispatch, inspection, equipment—was specifically designed to induce Plaintiff's individual continued residence. (4)*Justifiable reliance* — Plaintiff remained in the exposure zone for 181 days and 4,344 hours in direct reliance on the false safety declaration. (TAC ¶¶ 145, 153.) As established under the *Cuffy* reliance analysis, that reliance was entirely justifiable—WTC toxic contamination is invisible, odorless, and its injuries latent. There was no observable signal the declaration was false. (5) *Damages* —latent disease known and unknown, including systemic autoimmune disease, cardiac sarcoidosis latent conditions known and unknown from October 2023 forward. (TAC ¶¶ 97–110, 151, 170, 179.) *Special relationship*—The same *Cuffy* analysis that establishes the special duty for negligence satisfies the special relationship requirement for fraud. *Downing*, 117 N.Y.S.3d at *5. The City dispatched its agent to Plaintiff specifically, in response to her specific call, made individualized false representations directly to her, and she individually relied. That is a special relationship.

Plaintiff's fraudulent misrepresentation claim states a plausible cause of action under New York law. It is not futile.

### ix. Dismissal With Prejudice Is Particularly Unwarranted Given Plaintiff's Pro Se Status and the Gravity of the Claims

The Second Circuit has consistently held that district courts should not dismiss pro se complaints with prejudice "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009). A liberal reading of the TAC gives far more than an indication — it presents three legally cognizable New York state law causes of action, supported by specific individual facts, on claims that have never been adjudicated on their merits under Judge Hellerstein's governing New York law framework. Plaintiff lived roughly 400 meters from Ground Zero while pregnant, called the City for help, was told by the City's own agent that her apartment was safe without any testing, and spent 4,344 hours in toxic exposure as a direct result. She now suffers from latent disease. To permanently close the courthouse doors to those claims—before a single merits ruling under New York state law on the TAC's new factual allegations—would be legally unwarranted under *Cuoco*, *Loreley*, and *Shomo*, and contrary to the liberal amendment policy that governs in this Circuit.

The City's futility argument fails on every ground. The prior dismissal was jurisdictional — not a merits ruling under New York state law. The TAC presents three distinct New York state law causes of action — negligence, gross negligence, and fraudulent misrepresentation — each with specific factual allegations that plausibly satisfy their respective elements under the law Judge Hellerstein has ruled governs this action. The notice of claim is timely under the latent injury discovery rule, and the City's accrual argument depends on a congenital condition that cannot trigger accrual and an admitted-edited evidentiary record that warrants an adverse

31

inference. The City's special duty futility argument addresses none of the three independent New York law grounds — *Cuffy*, *Palka*, and N.Y.C. Charter §§ 556 and 563 — on the merits. And the City's motion does not engage with gross negligence's reckless disregard standard or fraudulent misrepresentation's distinct elements at all. Dismissal with prejudice must be denied.

## IV. CONCLUSION

For the forgoing reasons, Plaintiff respectfully requests that the Court deny the City's 12(b)(6) Motion to Dismiss.

Respectfully submitted,

Dated: Stockholm, Sweden
     March 20, 2026

/s/ Josephine M. Jules
Josephine M. Jules, Plaintiff Pro se
Dalagatan 20 A, Lgh 1201
113 24 Stockholm, Sweden
+46 72 835 67 97
josiejules@outlook.com